WEAVER ORGANIZATION, INC., et al., Plaintiffs, *v.* ALFRED A. MANETTE et al., Respondents-Appellants; P & F INDUSTRIES, INC., Appellant-Respondent. STUYVESANT PRESS CORP., Respondent, et al., Defendants.

First Department, March 15, 1973.

*Earle K. Moore* of counsel (*Harold L. Fisher, Stephen S. Danetz, Andrew S. Fisher* and *William M. Guttman* with him on the brief; *Harold L. Fisher, Gary M. Axenfeld* and *Moore, Berson & Bernstein,* attorneys), for appellant-respondent.

*William G. O'Donnell* (*Stuart F. Gartner* with him on the brief), attorney for Alfred A. Manette and another, defendants-respondents-cross-appellants.

*Per Curiam.* Three actions, consolidated by orders of Supreme Court, New York County, are here considered. **Involved on**

the one hand are Alfred and Sidney Manette, and Irving Levinson (the selling stockholders), Stuyvesant Press Corporation, of which the selling stockholders were principals; on the other hand are P & F Industries, Inc. (Industries), its wholly owned subsidiary, P & F Press, Inc. (P & F), Sidney Horowitz and Eugene L. Solomon, who are principals in Industries, and a cluster of other corporate subsidiaries, a recital of which is not essential to disposition of the case. On March 3, 1969, P & F entered into a written agreement with Stuyvesant's selling stockholders by which P & F was to acquire the stock of Stuyvesant in exchange for a number of shares of Industries based on the value of Stuyvesant shares as shown by Stuyvesant's February, 1968 financial statement, warranted by Stuyvesant. P & F was to provide substantial financing for the purchase of new printing equipment, mainly a large press. P & F was to have full access to the books and records of Stuyvesant and representations made in the agreement were to survive any investigation made by P & F prior to closing. It was represented that Stuyvesant had no liabilities save as set forth in the statement, and that the value of its inventory was " reflected at the lower of cost or market." It was further agreed that Alfred Manette and Levinson were to be given positions for seven years at $45,000 per annum, guaranteed for the first two years by Industries; the guarantee also covered the sums to be advanced for new equipment. After the closing, $150,000 was advanced to purchase equipment, and $40,000 was loaned to Alfred Manette.

It was ascertained after a short period that the statement of inventory furnished was incorrect. It soon became apparent, as printing work in progress advanced toward delivery, that its selling price would not be high enough to produce expected profits above production cost. Investigation, inclusive of questioning of Stuyvesant personnel by a P & F representative, disclosed that, indeed, the inventory value had not been stated " at the lower of cost or market " but at selling price. When it was further ascertained that Stuyvesant's statement of liabilities had omitted the amount of salesmen's commissions, a most important item of production costs, it soon became apparent that the financial status of the newly acquired corporation, as given by the selling stockholders to the purchaser, was, to say the least, distorted. The difference between the projected picture and that uncovered by the investigation was approximately $100,000. Seeking to make the best of a bad bargain, the P & F principals met with the selling stockholders and offered to call the deal off and to afford the selling stockholders an **opportu-**

nity to restore the advances and loans received over a period of time. This oral offer of rescission was rejected, and demand was made for a continuance of the advances. The next step taken was a meeting in September, 1969 of directors of Industries at which formal action to rescind was authorized. The contract required that rescission could be initiated only by a writing.

At this juncture, it should be stated that there is no point in distinguishing action taken by Industries from that taken by P & F Press. The former owned and controlled the latter. Though the contract was made by P & F, Industries cannot be relegated to the status of mere guarantor: it actually provided the finances and made the decisions, some implemented through its vassal, P & F, and some directly. Each must therefore be considered for the purposes of this case to be the alter ego of the other.

Before formal action to rescind could be taken, the selling stockholders instituted suit in October, 1969 against Industries and P & F (and several subsidiaries) for breach of contract and breach of the guaranteed employment agreements (Action No. 1). Then the selling stockholders, though they had ceased to be directors of Stuyvesant upon its acquisition by P & F, took steps under the Federal Bankruptcy Act (tit. 11, ch. 11) to adjust the liabilities of that corporation; the immediate tangible result of that action was to bring about a direction by the bankruptcy court to reduce the Manette and Levinson salaries by $15,000 a year to $30,000. Shortly after Action No. 1 was instituted, P & F and Industries (and subsidiaries) sued the selling stockholders and Stuyvesant for rescission, based on fraud and misrepresentation in the inducement, and for monetary damage resulting therefrom. A year later, in a third action, Stuyvesant and an affiliate corporation sued P & F, Industries, and their principals for damage caused, it was alleged, to plaintiffs in that suit as third-party beneficiaries of the contract of purchase by reason of withholding of continued financing of the new equipment, as well as conspiracy to destroy their business. In the interval, in April, 1970, in an endeavor to salvage something of value from the transaction, P & F offered to pay the difference owing to the seller of the new press, the most important item of new equipment, to have it taken over by another subsidiary of Industries, and to credit Stuyvesant against the advances with the down payments Stuyvesant had made to the supplier of the press; the offer was refused.

The consolidated cases were tried to the court without a jury. The court found no misrepresentation by the selling stockhold-

ers because P & F had had full access to Stuyvesant's records; that there had been full disclosure, apparently referring to an alleged oral disclosure concerning salesmen's commissions; that P & F and Industries did not raise a claim for rescission until they had decided to renege on the agreement; that the chapter 11 move had saved Stuyvesant from disaster brought about by P & F's willful and intentional breach; that the offer to take over the new press was a gesture in the same direction; that Industries was responsible for the guarantee of the two salaries reduced by the bankruptcy court and was required to pay the difference of $15,000 each;[*] that Stuyvesant was damaged to the extent of $100,000, and the advance of $150,000 for purchase of equipment is forfeit, this by some theory of offset which does not deduct the damage awarded to Stuyvesant against Industries; that the $40,000 loan to Alfred Manette is not recoverable because it had been agreed that it is not to be paid until he is permitted to sell his stock in Industries. The decision cannot stand.

Regardless of the motives of the stockholders, the two principal items that were not revealed, whether or not deliberately concealed, are most material to one purchasing a going business because they are basic to whether or not a profit can be made. Access to books and records is not a substitute for required revelation, especially when information furnished has been distorted, and, most particularly, when what is to be found in the books and records is not, unless on the closest and most informed examination, to be substituted for erroneous information furnished in the form of conclusion, i.e., the inventory figures. And, as to the salesmen's commissions, an oral statement is no substitute for a written representation in the contract. Further, it must be remembered that the contract provided for survival of the representations even after investigation. In sum, one does not renege on a contract when, quite obviously, had the truth been known, there would have been no contract. We disagree with other inferences and conclusions, having little to do with credibility evaluations, made by the Trial Justice. The meeting at which an oral rescission offer was made and the offer to take over the new press were apparently seen by him as moves in a conspiratorial process of reneging; we see them as a prudent effort to cut losses. The "damage" assessed against P & F in favor of Stuyvesant is nowhere explained in decision, findings or conclusions; it might have been plucked out of the

---

[*] Manette and Levinson, dissatisfied with this award for one year's reduction only, have cross-appealed to increase this amount.

air. Reference is made to an offset, never explained except possibly for the forfeiture of the $150,000 advance, which is not offset. Is it to be concluded that damage, if any, was actually $250,000 of which $100,000 remains after deduction of the advance? And are Alfred Manette and Levinson to be paid for reduction of their salaries by reason of their own unauthorized act as directors *functus officio* of Stuyvesant in having sought the processes of chapter 11?

The only logical conclusion to be derived from the evidence — and, again, this is not a credibility judgment — is that Industries and P & F are entitled to judgment of rescission in the disclosed circumstances and to be returned to *status quo* : repayment of $150,000 advanced, deletion of the damages awarded to Stuyvesant, and to Alfred Manette, and Levinson. As to the $40,000 loan to Alfred Manette, the condition precedent to repayment, i.e., sale of the stock of Industries, can never eventuate, and, the transaction as to him being part and parcel of the main transaction, rescission must also necessarily result in complete return of P & F to *status quo,* and therefore judgment against him for the amount of the loan. The case having been tried non-jury, it is our duty to substitute an appropriate judgment for that granted by the trial court.

Our disposition is not based in any wise upon errors in the admission of evidence; we have been adverted to none. The trial court did, however, err, in our view, in several important respects : in drawing unwarranted inferences from that evidence; in permitting testimony as to conversations to dominate over written contractual provisions; in apparently considering as immaterial certain representations to the purchasers, deemed by the parties to be of sufficient importance, they had agreed, to survive inspection by the purchasers; and in failing to give appropriate weight in terms of legal consequence to the writing itself. Therefore we reject those findings and conclusions of the trial court which are not in consonance herewith, for which we substitute those implicit in this decision.

Accordingly, insofar as appealed from, the judgment entered August 2, 1972, should be reversed on the law and the facts in all details thereof, and defendant-appellant-respondent P & F Industries, Inc. should have judgment for rescission of the agreement of March 3, 1969, by reason of misrepresentation in the inducement thereof, and return to *status quo* by judgment against defendant-respondent Stuyvesant Press Corp. for $150,000, with interest from the date of advance of each portion thereof, and against defendant-respondent-appellant **Alfred**

Manette for $40,000, with interest from the date of payment to him, and otherwise the judgment should be affirmed, without costs. Settle judgment accordingly.

McGIVERN, J. (dissenting). I would affirm. This case is a classic type which fully illustrates the soundness of the rule which limits the power of an appellate court to reverse a finding of the trial court.

Although the Appellate Division may have the right to come to a new judgment contrary to that of the trier of the facts, it is sparingly used. (9 Carmody-Wait, New York Practice, p. 604, § 177. *Williams Eng. & Contr. Co.* v. *City of New York,* 222 N. Y. 1; *Caldwell* v. *Nicolson,* 235 N. Y. 209.) The reluctance of appellate courts to make new findings has been noted: '' Evaluations and determinations reached *de novo* at the appellate level, amounting, in effect, to complete redeterminations of basic issues, are usually best avoided. (Cf. *Power* v. *Falk,* 15 A D 2d 216, 218, *supra*; *Kundla* v. *Symans,* 9 A D 2d 1021.) It must be observed, however tritely, that the Trial Judge, having observed the witnesses, having viewed the premises and having gauged the proof as it was developed, is better qualified to weigh the determinative facts.'' (*Conklin* v. *State of New York,* 22 A D 2d 481, 483).

But the majority herein have reversed the Trial Judge out of hand, without finding any application of an erroneous theory of law or an erroneous ruling in the admission or exclusion of evidence, and they have found no failure to give conflicting evidence the relative weight which it should have. Thus, there is no basis for the substitution by this court of its own speculative assessment for the findings of fact and corollary conclusions made by the Trial Judge after a long trial lasting some three weeks.

This is particularly so here where the personal relationships of the parties, involving reliance on statements made, and disputed, played a crucial part in the litigation. Contrary to the view of the majority, I believe credibility was a proper foundation of the Trial Judge's disposition, and not as the majority of this court would have it — upon the isolated dissection of one provision of that agreement, wherein representation was made that the evaluation of the inventories to be taken control of by P & F, through the medium of its subsidiary Press, '' were reflected at the lower of cost or market '', and the assumption that if the Stuyvesant stockholders had not in fact used such method for the evaluation of the inventory then, as a matter of law, P & F, which was in actual control of Press, was entitled to rescind the contract with the Stuyvesant stockholders. Only

thus does the majority of this court try to escape the issue of credibility, which lies at the heart of this case, and upon which a correct disposition must be made.

In short, what the majority of this court erroneously rejects and the trial court properly considered, was the materiality of the representation, as reflected not alone by its containment in the agreement, but by the conduct of the parties; also whether the indifference of, and failure to object to the given method of evaluation by the officers of P & F, after having had made available to them all of the books and records of Stuyvesant, whose financial operations they were in charge of during the entire period in excess of two months intervening the making of the contract and the " closing " of the contract on May 15, 1969, in effect constituted a waiver of any right it might have had by timely objection. Particularly, where such claim of breach of warranty continued not to be asserted for a further period of some four months after the closing, up until September of 1969, when, for reasons of its own, P & F no longer finding the contract advantageous sought to walk away from the obligations it had assumed. This, after the making of wholly unfounded and reckless charges and threats of criminal prosecution for fraud against the Stuyvesant stockholders.

Although the record is not clear whether the evaluation given was the lower of cost or market, it is clear that P & F failed to submit proof — the burden of establishing which was upon it — that the lower of cost or market had not been used. Notwithstanding, even if a reading of the record warranted a conclusion that it had not been, which is the assumption of the majority, considerations beyond that, as above indicated, are and were imperative to a correct disposition of this case.

That such additional elements could not be readily dismissed was fully recognized by P & F when it commenced its action for a judicial rescission, following imprudent previous declarations of a unilateral rescission, whereby it announced that it had no intent to abide by its contractual obligations whereby it guaranteed performance of the obligations assumed by its subsidiary, Press, including the requirement that Press furnish certain financing, such as funds to acquire a new printing press known as the Hantsho Press. The complaint in this action was predicated upon a charge of fraud in the inducement of this contract. That fraud in the inducement was the gravamen of its action, is evidenced by its having procured, on the basis of its charges, an ex parte attachment upon property of Stuyvesant. The entire trial was predicated upon this claim of fraud in the inducement.

P & F's attack was concentrated not upon the method of evaluation, but upon (1) a claimed erroneous representation of the quantity and character of the inventory, based solely upon an inventory undertaken by one of its officers, of questionable experience, made four months after the closing of the agreement, following which, much of the inventory was consumed and used in the course of normal business operations, (2) a claimed failure to disclose obligations for commissions to salesmen, and (3) a claimed erroneous statement in respect of the stockholders' equity in Stuyvesant.

Having failed to establish by a preponderance of the evidence *scienter,* intent to defraud, it tacitly abandoned a claim to rescission based upon fraud by moving at the close of the trial to conform the pleadings to the proof. This, undoubtedly, in reasonable anticipation of the trial court's ultimate rejection of its claim to rescission based upon the charge of fraud. Thus, it rested its claimed right to rescission upon the bare fact of a simple unintentional misrepresentation of the method used to evaluate the inventory. This, after admitting at the trial, upon cross-examination, that its verified complaint exaggerated by many thousands of dollars what it conceived to be the true value of the inventory. The other charges warrant no consideration, having been clearly shown to lack merit. The claim by P & F's officers that they were unaware of any obligations owing for commissions to salesmen by Stuyvesant was so patently untrue, in view of the schedule annexed to and part of the reorganization agreement, as to properly cause any Trial Judge to bristle and question their good faith.

Now, on appeal, P & F, abandoning its effort to establish fraud, adverts this court's attention to what it considers to be the proper consequence of a simple misrepresentation, stripped of any intent to defraud; and also, it hopes, stripped of considerations of materiality in fact, stripped of considerations, affecting waiver of rights, that might otherwise be assertable. Its failure to make timely objection to facts readily available by simple diligence may not be ignored in considering a possible finding of waiver, nor in passing upon the question as to whether the representation was in fact material.

A contract must be read in its entirety and particular provisions must often give way to the true intendment of the parties as reflected in their treatment of them. As stated by now Chief Judge FULD " intent and meaning are to be gathered, not alone from the language and terms of the instrument itself, but also from the conditions and circumstances extrinsic to it."

(*Spencer* v. *Childs,* 1 N Y 2d 103, 107.)   There is, as was noted by LEARNED HAND, and recalled by then Judge FULD, " ' No more likely way to misapprehend the meaning of language   *   *   * than to read the words literally, forgetting the object which the document as a whole ' seeks to achieve " (pp. 106–107).   And we must not lose sight of the fact that the officers of P & F were sophisticated businessmen.   We do not here deal with misrepresentation made to a naive or neophyte investor.

Some of the testimony of the officers of P & F was so patently and so palpably untrue as to understandably cause the Trial Judge to find no equitable basis for a judicial rescission and to observe that evidence in support of Stuyvesant's claim for tortious interference with contract and neglect of fiduciary duty, and in support of the Manettes' claim for breach of contract, to be " overwhelming ".

Thus, I can find no valid basis for disturbing and usurping the function of the trial court.   The majority of this court, on the cold record alone, by substituting its judgment for that of the trial court, as to its findings of fact, has not only usurped the function of the Trial Judge, but in so doing, in my view, acted beyond its scope of its statutory grant of power, as regulated by the general rules of law pertaining to appeals to this court. (*People ex rel. MacCracken* v. *Miller,* 291 N. Y. 55, 61.)

And as for the damages awarded, it need only be observed that the respective amounts awarded to Stuyvesant and the successful individual plaintiffs, were well within the ambit of the proffered testimony found to be credible.   Absolute precision in the measurement of damages, particularly in cases involving assaults upon, and attempted scuttling of, business privileges and opportunities, as has been frequently noted in cases involving unfair competition, and unlawful diversion of business, is a requirement neither achievable nor necessary.   If there be a gray zone, he who tortiously interferes with or trespasses upon the rights of another, must be held liable to account and not the person wronged.   In any event, I find little to suggest there is truly a gray zone, and the damages awarded against P & F, under no erroneous theory of law, were justifiably found to have been the product of its tortious conduct.

In sum, I do not think the facts as developed before the Trial Judge were insufficient as a matter of law to sustain the judgment; nor do I think the majority opinion contains the requisite new findings of specific and ultimate facts, necessitated when the Appellate Division decides to discard the conclusion of a Trial Judge and go in a completely opposite direction.   (*Caldwell* v.

*Nicolson,* 235 N. Y. 209.)   The majority would have been better advised to have ordered a trial *de novo,* with costs to abide the event.   (*Power* v. *Falk,* 15 A D 2d 216, 218.)

STEVENS, P. J., MARKEWICH, NUNEZ and LANE, JJ., concur in *Per Curiam* opinion; McGIVERN, J., dissents in opinion.

Judgment, Supreme Court, New York County, entered on August 2, 1972, insofar as appealed from, reversed, on the law and the facts in all details thereof, and defendant-appellant-respondent P & F Industries, Inc. should have judgment for rescission of the agreement of March 3, 1969, by reason of misrepresentation in the inducement thereof, and return to *status quo* by judgment against defendant-respondent Stuyvesant Press Corp. for $150,000, with interest from the date of advance of each portion thereof, and against defendant-respondent-appellant Alfred Manette for $40,000, with interest from the date of payment to him, and otherwise the judgment should be affirmed, without costs and without disbursements.

Settle judgment on notice.