**METRO-GOLDWYN-MAYER INC.,**
**Plaintiff,**

v.

**Jerry ROSS and Arthur B. Ross,**
**Defendants.**

**HERITAGE RECORDS, INC., et al.,**
**Plaintiffs,**

v.

**METRO-GOLDWYN-MAYER INC.,**
**et al., Defendants.**

**Nos. 71 Civ. 1728, 71 Civ. 2653.**

United States District Court,
S. D. New York.

July 23, 1973.

As Amended July 31, 1973.

---

Davis, Polk & Wardwell, New York City, for Metro-Goldwyn-Mayer; Michael Curb, Daniel F. Kolb, Sue Ann Dillport, and Mark L. Austrian, New York City, of counsel.

Hofer, Rich & Grubman, New York City, for Jerry Ross, Arthur B. Ross, Heritage Records, Inc., Colossus Records, Inc., Colossus Promotions, Inc., Legacy Music, Inc., Collage Music, Inc., Jerry Ross Productions, Inc.; Arnold I. Rich, and Paul Schindler, of counsel.

## OPINION

STEWART, District Judge:

MGM, Inc., the plaintiff in the first captioned action is engaged among other things in the phonograph record and music publishing business. The defendants, Jerry and Arthur Ross were, prior to April 21, 1970, sole stockholders of Colossus Records and Heritage Records (phonograph record companies), Legacy Music and Collage Music (publishing companies) and Colossus Promotions. These companies will be referred to as the Ross Companies. The individual defendant remaining in the second action at the time of trial, Mr. Curb, was the President of MGM Records, a subsidiary of MGM. Claims against two other defendants who were served in the second action, Mr. Melniker and Mr. Weinstein, were dismissed with prejudice at the commencement of the trial.

The suit by MGM is to rescind a series of four contracts entered into by the parties on April 21, 1970 on the basis of alleged violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities and Exchange Act and common law fraud and misrepresentation. The Ross Companies counterclaimed and brought suit for breach of contract and for alleged violations by MGM of the federal securities laws. These actions were consolidated and tried before this Court without a jury.

The four contracts entered into by the parties are described in detail in a 56-page statement of facts stipulated to by the parties. They include an Exchange agreement, Loan agreement, Employment agreement and a Motion Picture Scoring agreement. Generally, these agreements pertain to the sale of the Ross Companies stock to MGM[1] and the acquisition by MGM of the services of Jerry Ross[2] in exchange for shares of MGM stock and a commitment by MGM to finance the operations of the Ross Companies.[3] The Exchange agreement provided for various warranties and representations by Jerry and Arthur Ross

---

1. More specifically, the Exchange agreement provided for an acquisition by MGM of 80% of the stock of the Ross Companies in return for payment by MGM of 8,333 shares of its unregistered capital stock to Jerry and Arthur Ross. The shares were valued at $300,000 and pursuant to a formula, Jerry and Arthur Ross could earn additional shares over a 5-year period depending upon the future earnings of the Ross Companies.

2. The Employment agreement provided that Jerry Ross was to loan his services to MGM including but not limited to "the creativity and selection of product and/or producers, promotion, sales and merchandising, advertising, collection of accounts receivable and hiring and firing of personnel".

This agreement was entered into by MGM and Jerry Ross Productions, Inc. Jerry Ross is the sole owner and president of the latter.

3. The Loan agreement obligated MGM to finance the operations of the Ross Companies in an amount not to exceed $500,000 per year in each of two fiscal years, but only if in the judgment of the board of directors of the Ross Companies such funding was essential for the Ross Companies to operate within the limits of the operating budget. The budget was to be attached to the Loan agreement. The board of directors was to consist of three persons designated by Jerry and Arthur Ross, and six persons designated by MGM.

pertaining to the sale of the Ross Companies, which will be referred to throughout this opinion. Additionally, the Exchange agreement provided that MGM had rights to investigate the assets and business of the Ross Companies and that MGM, in case of a specified net loss, could terminate the agreements which would result in Jerry and Arthur Ross being able to retain or obtain from MGM, MGM stock valued at $500,000.

The Motion Picture Scoring agreement gave to Jerry Ross the opportunity to compose or score at least one motion picture or television special selected by MGM in return for payment by MGM of $10,000. The $10,000 was guaranteed to Ross regardless of whether he actually scored a motion picture or T.V. series. This agreement was primarily an inducement to the Ross brothers to enter into the four agreements.

These agreements were closed on October 8, 1970 and certain modifications were agreed upon at the closing. Among these was the receipt by the Rosses of 4,167 additional shares of MGM common stock. This was to assure that Jerry and Arthur Ross would receive the full value of the 8,333 shares as the price of the stock had diminished since April 21. Tied into this arrangement was an option on the part of MGM to purchase these additional shares for $5,000 exercisable up to three years from the date of the closing.

Other modifications included the cancellation of the Motion Picture Scoring agreement, saving MGM $10,000 and certain deletions in the Loan agreement.[4]

MGM claims that various statements, representations and warranties made by Jerry and Arthur Ross in the agreements were not true as of the closing date and therefore Securities Exchange Act Rule 10b–5 and principles of equity well established in New York require

that the acquisition transaction be set aside. MGM also seeks consequential damages and money already paid by it pursuant to the agreements.

Jerry and Arthur Ross claim that they disclosed all facts that they were obliged to disclose and that after the closing MGM breached the contracts as modified by failing to fulfill its obligation to finance the operations of the Ross Companies. They further claim that as the situation of the Ross Companies grew more tenuous MGM coerced Jerry Ross into entering into a new funding agreement [the December 8 agreement] under which MGM was no longer obligated to advance $500,000 to the Ross Companies in each of two fiscal years, but instead was obligated to advance $30,000 per month and not to exceed $360,000 per year. It is the thrust of the Rosses' contention that MGM contrived to rescind the agreements, to recover the MGM stock already paid and to avoid paying the additional shares all totaling $500,000.

This Court has jurisdiction of these actions under Section 22 of the Securities Act of 1933, as amended, 15 U.S.C. § 77v and under Section 27 of The Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa in that the transactions in issue constituted an offer and sale of securities by use of the means and instrumentalities of interstate commerce. This Court also has jurisdiction under 28 U.S.C. § 1332 in that the parties are of diverse citizenship and the amount in controversy exceeds $10,000 exclusive of interests and costs.

Before turning to the merits, MGM has raised the initial question of standing of the Ross Companies and Jerry Ross Productions, Inc. to bring their claims under Rule 10b–5 in that these companies are not purchasers or sellers of securities.

4. The April 21 Loan agreement entitled the Ross Companies to financing without seeking the approval of the board of directors if the sales of the Companies averaged not less than $400,000 per quarter. This provision was deleted at the closing.

Rule 10b–5 provides in pertinent part: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange

. . . . . .

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

in connection with the purchase or sale of any security." 17 C.F.R. § 240.

It has been firmly established that a plaintiff who is neither a purchaser nor a seller has no standing to sue for damages under Rule 10b–5. E. g., Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L. Ed. 1356 (1952).

While the Second Circuit has generally adhered to a restrictive view of the Birnbaum doctrine, GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), we cannot conclude that the purchaser-seller requirement is applicable to a situation where as here the plaintiff Companies issued the stock and the sole stockholders of the Companies have undisputed standing as sellers. There is no question that a cause of action under 10b–5 has been otherwise properly alleged. The only question is whether the Ross Companies, issuers of the stock, but not named parties to the alleged fraudulent exchange transaction, nevertheless have standing under 10b–5. We conclude they do.

Turning now to the merits, we consider first the various claims by MGM that Jerry and Arthur Ross failed to make full disclosure of material facts.

MGM contends that the Ross Companies failed to disclose the termination of the contract of Colossus Records' principal singing group, the Shocking Blue prior to the closing date. Exhibit B of the Exchange agreement consisted of a list of contracts which were represented to be in effect, not having been terminated or cancelled. This list included the contract with the Shocking Blue. Additionally, the Exchange agreement warranted generally that "the representations and warranties of sellers . . . shall, except as set forth herein, be true on and as of the closing date with the same force and effect as though made on and of the closing date". It is undisputed that about one week prior to the closing Jerry Ross was notified by letter from the attorney for the Shocking Blue that the contracts between Colossus and Shocking Blue were terminated. Such termination was the culmination of a dispute that Ross had with the group over the payment of royalties. The evidence leaves little doubt that Ross was obligated to disclose the fact of this termination to MGM. The relationship between the Ross Companies and Shocking Blue played a significant role in the early negotiations between the president of MGM Records, Inc., Michael Curb and Jerry Ross. For the nine months ending August 31, 1970 the Shocking Blue recordings had accounted for 46% of all sales of single records and 53% of all sales of albums by Colossus Records, the principal Ross company. It is likely that the Shocking Blue's potential importance significantly enhanced the stature of the Ross Companies in their early days and provided the negotiations with momentum that culminated in the April, 1970 agreements. That the importance of the Shocking Blue may have diminished by the time of the closing does not obviate the responsibility of Ross to disclose the termination of their contract.

The testimony is conflicting, however, as to whether Jerry Ross actually did disclose to Curb or other MGM personnel prior to the closing the fact of the termination of the Shocking Blue contract. Curb of MGM testified that he was aware that Colossus Records was

withholding royalties from Dureco, the manager-agent of the Dutch singing group, and that Colossus had problems in receiving product. The evidence shows that Ross had discussed the contents of prior communications between Dureco and himself with Curb and others at MGM. This fact, along with evidence, some of which is undisputed, that Ross had continually advised Curb of the status of the dispute with the *Shocking Blue*, lends credibility to the testimony of Ross that he had disclosed the contents of the termination letter during telephone conversations with MGM executives.

We conclude that Ross took affirmative steps to disclose to MGM the termination of the *Shocking Blue* contract as he was clearly obliged to do.

■ MGM next contends that the failure of the Ross Companies to collect the October 8 accounts receivable within six months constitutes a breach of warranty justifying rescission.

The April 21 Exchange agreement warranted that "the accounts and notes receivable of Ross Companies are valid and enforceable . . . subject to no offset or counterclaim, are fully collectible and will be paid within six months from the date hereof". As with all warranties contained in the Exchange agreement, this representation was to be true on and as of the closing date as though made on the closing date.

Thus, MGM contends that the six month provision must be construed to mean six months from the closing date and not six months from April 21 when the agreements were signed and the warranties effectuated. This theory cannot withstand close scrutiny. Ross warranted on April 21 that the Ross Companies' receivables would be collected and paid "within six months from the date hereof". The "date hereof" was clearly April 21 and the reference to receivables was to the April 21 receivables. The provision that all representations

would be true as of the closing date as if made on the closing date is a general reaffirmation which could not have been intended to alter the specifics of the various other warranties. Ross contends that if the parties intended to provide that the accounts receivable would be collected within six months of the closing date, they would have so stated. We agree.

Since MGM has made no claim with regard to the collection of the April 21 receivables, this particular claim is dismissed.

■ MGM further contends that the large amount of returns received by the Ross Companies rendered those receivables uncollectible and subject to offsets in violation of the express warranty that all receivables were fully collectible and subject to no offset. While MGM concedes that it would expect a reasonable number of returns, it contends that it is properly complaining as to an unreasonable number of returns.

The only question relevant to this claim, however, is whether the term "offset" was contemplated to include returns at all. The testimony shows that MGM expected the Ross Companies to authorize some returns of records they sold and that at the time of the closing Curb of MGM Records was aware that a certain number of records had been returned. Moreover, the testimony shows that it is common industry practice for record companies to authorize returns. It would be unreasonable to interpret "offset" to include returns and thereby justify rescission on the grounds that Jerry and Arthur Ross entered into a contract they could not possibly keep and which MGM knew they could not keep.

■■ MGM's next claim is that Jerry and Arthur Ross failed to disclose the volume of "no charge" records which the Ross Companies distributed over and above the 3 on 10 (singles) and 2 on 10 (albums) or so-called "Free Records".

It is undisputed that it is common practice in the record industry to distribute "free records" at a ratio of 2 or 3 for every 10 sold. This practice is a method of pricing records sold to wholesale distributors. It is also common for some record companies to give away records over and above these free records for promotional purposes. The parties do not contest that Ross employees disclosed to the MGM-employed purchase investigators that Colossus Records used the "Free Record" method of pricing. It is also agreed that between October, 1969 and October 8, 1970 (the date of the closing) the Ross Companies sent 66,400 singles and 5,900 albums at no charge to wholesale distributors for promotional and advertising reasons. MGM contends that it was never told accurately how many free or no charge records were distributed and that while the purchase investigator was told of the 2 on 10, 3 on 10 pricing method, he was not told of the more than 70,000 additional no charge records. MGM concedes that it knew of a few no charge records distributed by the Ross Companies but insists that it was never advised of the full volume.

Jerry and Arthur Ross were obliged by contract to take affirmative steps to disclose to MGM that substantial numbers of no charge records over and above the 2 and 3 on 10 Free Records were being sent to distributors. Any matter or information "which may affect the desire of investors to buy, sell or hold the company's securities" requires full disclosure, e. g., SEC v. Texas Gulf Sulpher Co., 2 Cir., 401 F.2d 833, 849. Nevertheless, MGM's claim must be determined in light of all the circumstances. The evidence clearly establishes that MGM should have known and Jerry and Arthur Ross might reasonably have assumed MGM to know the approximate volume of no charge records distributed by the Ross Companies. The testimony and the evidence point to a combination of facts that lead us to this conclusion. First, Michael Curb, the President of MGM Records at the time these agreements were effectuated, was fully aware that Colossus Records and Heritage Records had been sending no charge records to distributors. Second, MGM had itself engaged in the practice of giving away no charge records and it is standard industry practice to do so. Third, Curb had engaged in conversations with Jerry Ross regarding the shipment of no charge records to particular distributors. Finally, the MGM purchase investigators, although not authorized to conduct a complete audit, were given inventory cards which, if viewed in the light most favorable to MGM, listed all but 12,500 of the 70,000 no charge records set forth in the statement of agreed facts.

A recent New York decision, Weaver Organization v. Manette, 41 A.D.2d 138, 341 N.Y.S.2d 631 (Mar. 15, 1973), holds that access to a company's books and records pursuant to a stock purchase transaction is not a substitute for full disclosure. We do not quarrel with this theory; rather we hold that under the circumstances here present, MGM's allegations of non-disclosure have not been sufficiently established. While the record is replete with self serving statements of witnesses, when we view the information given to the purchase investigators together with the prior knowledge of Curb that the Ross Companies were actively giving away records for promotion—an important aspect of the record business, it is evident that the Rosses might properly have assumed that MGM was in command of all the information it needed or desired.

Having determined that there exists no basis by which to rescind the contracts, we now turn to the Ross allegations that MGM breached the agreements primarily by failing to fulfill its obligation to finance the Ross Companies.

 MGM's obligation under the Loan agreement as modified was to provide such financing which, in the judg-

ment of the board of ·directors of the Ross Companies, would be essential for the Ross Companies to operate. MGM breached its obligation by continually neglecting to call a meeting of the Ross board so that it could properly determine the amount of funding needed by the Ross Companies. MGM's Vice President, Ben Melniker, testified that at the closing he advised Jerry Ross to refer the matter to Curb. Ross made numerous demands for board meetings, which went unheeded. He was unable to persuade MGM executives to arrange to finance the Ross companies despite the fact that MGM executives knew that the Ross Companies needed money to pay debts and to operate.

Instead, MGM proposed a new funding arrangement pursuant to which the Ross Companies were to receive $30,000 per month and up to $360,000 per year. The evidence shows that Jerry Ross entered into this agreement on December 8, 1970 reluctantly and under duress. The Ross Companies were in immediate need of financing, and Ross was advised by MGM that the only way funding could be had was if he [Ross] would enter into this modified agreement.

We conclude that MGM breached the April 21, 1970 agreement by failing to provide financing to the Ross Companies and by compelling Jerry Ross to enter into the modified December 8 funding agreement.

MGM contends that the December 8 agreement provided a workable solution to the problems of the Ross Companies. While the new arrangement did provide benefits not otherwise available under the April 21 agreements,[5] the evidence

shows that even after December 8, 1970, MGM did not fulfill its obligations under the new agreement. Accounts receivable were not collected and the monthly payments were lax. MGM's contention that Ross made compliance difficult by refusing to supply MGM with financial or other necessary information has not been borne out.

Having concluded that MGM is liable for breach of the April 21, 1970 Loan agreement, we feel no need to deal with Jerry and Arthur Ross' contention that MGM breached the Stock Purchase agreement by failing to register the 12,500 shares of MGM stock delivered to them on the day of the closing.

We reject the Rosses' contention that MGM should have released a $20,000 contingency fund provided for under the agreements. The evidence shows that these funds were earmarked solely for the purpose of paying royalties under a prior agreement and that MGM was not obligated to release these funds.

■ Under Section 11 of the Exchange agreement MGM had the right to terminate the agreement provided certain conditions set forth in that section were met. The agreement provided that if MGM did terminate, Jerry and Arthur Ross would be entitled to $500,000 of MGM's stock, including the stock previously delivered to them.

The 12,500 shares of MGM stock delivered to Jerry and Arthur Ross at the closing were valued at $300,000 for purposes of the agreement.

The Court accordingly concludes that Jerry and Arthur Ross are entitled to $200,000 damages.

It is so ordered.

---

5. Under the December 8 agreement in addition to the funding arrangement, MGM Records was to perform various services for the Ross Companies including the collection of accounts receivable, processing returns, and coordinating pressing plants. For these services the Rosses were to pay to MGM Records 10% of the amount collected.