**METRO–GOLDWYN–MAYER, INC.,**
**Plaintiff-Appellant,**

v.

**Jerry ROSS and Arthur B. Ross,**
**Defendants-Appellees.**

**HERITAGE RECORDS, INC., et al.,**
**Plaintiffs-Appellants,**

v.

**METRO–GOLDWYN–MAYER, INC., et al., Defendants-Appellees.**

Nos. 80, 81, 82, Dockets 73–2271, 73–2306, 73–2686.

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1974.

Decided Jan. 13, 1975.

S. Hazard Gillespie, New York City (Davis Polk & Wardwell, New York City, on the brief, Daniel F. Kolb, Sue Ann Dillport, Mark L. Austrian, New York City, of counsel), for plaintiff-appellant Metro-Goldwyn-Mayer, Inc.

Arnold I. Rich, New York City (Hofer, Rich & Grubman, New York City, on the brief), for defendants-appellees Jerry Ross and Arthur B. Ross and plaintiffs-appellants Heritage Records, Inc., and others.

Before SMITH, HAYS and MANSFIELD, Circuit Judges.

HAYS, Circuit Judge:

Metro-Goldwyn-Mayer, Inc. filed a complaint in the United States District

Court for the Southern District of New York alleging that the defendants, Jerry and Arthur Ross, had violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1970), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1974) by making misleading statements of material facts in connection with a stock exchange agreement with MGM and by omitting material facts necessary to make their statements to MGM not misleading. MGM also alleged that the Ross brothers had breached several of the warranties they had given in the agreement.[1] On these grounds, MGM demanded rescission of the agreement. The Ross brothers counterclaimed for damages for breach of a related loan agreement primarily on the ground that MGM had failed to provide the financing called for by that agreement. The district court dismissed MGM's claims for rescission and awarded the Ross brothers $200,000 in damages.[2] Metro-Goldwyn-Mayer, Inc. v. Ross, 363 F.Supp. 23 (S.D.N.Y.1973). We reverse.

## I.

Jerry Ross is a producer of records who prior to April 21, 1970, was the primary owner of Colossus Records, Inc. and a number of related record companies. When Michael Curb became president of MGM Records, a division of MGM, he set out to acquire the Ross companies for MGM in order to acquire the services of Jerry Ross, who had been responsible for a number of hit records.

On April 21, 1970, MGM and the Ross brothers signed a series of contracts, including an exchange agreement under which MGM was to receive an 80% interest in the Ross companies in exchange for 8,333 shares of MGM stock, valued for purposes of the agreement at $300,000. The Ross brothers were to receive additional annual payments of MGM stock over the next five years, depending on the earnings of the Ross companies. The exchange agreement was to be closed at a later date, and section 8(a) provided that all representations and warranties by the sellers would have the same force as though made on the closing date. In section 4(g) of the agreement, the Ross brothers warranted that all accounts receivable were valid, were subject to no offsets, and would be paid "within six months from the date hereof." In section 4(p) the sellers warranted that no statement of theirs to MGM contained or would contain any untrue statement of a material fact or an omission of a material fact necessary to make their statements as a whole not misleading.

Another contract signed on April 21 was a loan agreement, under which MGM was to provide financing of up to $500,000 for the Ross companies. The duty to provide financing was to become effective only if the board of directors of the Ross companies decided that such financing was necessary. The board was to consist of six members designated by MGM and three designated by the Ross brothers.

MGM engaged the certified public accounting firm of Arthur Andersen & Co. to conduct a "purchase investigation" of the Ross companies before the closing. The Andersen report, submitted in September, 1970, reflected representations made by Ross employees that the Ross companies followed the common practice of providing to distributors three so-called free records for every 10 single records purchased and two free records for every 10 albums. In the case of the Ross companies that meant that they charged 45 cents each for the first 10 single records sold and 17 cents each for the next three, for an average price of

---

1. The district court had jurisdiction over MGM's breach of warranty claims under the doctrine of pendent jurisdiction and also under 28 U.S.C. § 1332 (1970), since the parties were of diverse citizenship and the amount in controversy exceeded $10,000.

2. In view of our disposition of MGM's appeal, we need not deal with the Ross brothers' cross-appeal for additional damages nor with the appeal of the Ross record companies seeking reversal of the district court's dismissal of their breach of contract claims. See Part IV, infra.

38.5 cents and $2.42 for the first 10 albums and nothing for the next two, for an average price of $2.01. In general, the report was a good deal more pessimistic about the companies' financial situation than the Ross companies' accountant, Ellis Elgart, had been in his audit of the May 31, 1970 Ross financial statements. In that audit Elgart certified the worth of the Ross companies to be $358,000, while Arthur Andersen concluded that it should have been $39,750.

On October 8, 1970, the April 21 agreements were closed, with some modifications not relevant here.

## II.

In its claim for rescission, MGM relies primarily on the failure of the Ross brothers to inform it of some 70,000 records which the Ross companies had given to distributors free of charge, over and above the usual three on 10 and two on 10 arrangement, which MGM had been told was in force. Rejecting MGM's rescission claim, the district court held that although the distribution by the Ross companies of the additional 70,-000 records was a material fact, "MGM should have known and Jerry and Arthur Ross might reasonably have assumed MGM to know" the approximate number of such records. 363 F.Supp. at 29. We disagree.

■ The district court's conclusion that there had been no violation of a duty to disclose was based in large part on the fact that during the purchase investigation the Ross companies provided Arthur Andersen with inventory cards which, if explained and interpreted properly, could have revealed all but 12,500 of the 70,000 additional records. However, Rule 10b–5, as well as the terms of the exchange agreement, required the Ross brothers to state all material facts necessary to make other statements not misleading. See, e. g., SEC v. Texas

Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Such a duty is not discharged merely by giving the purchaser access to company records and letting him piece together the material facts if he can. Stier v. Smith, 473 F.2d 1205, 1208 (5th Cir. 1973); Weaver Organization, Inc. v. Manette, 41 App. Div.2d 138, 142, 341 N.Y.S.2d 631, 634–635 (1st Dep't 1973) (per curiam). Cf. Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956). Here as in Weaver Organization, Inc. v. Manette, supra, the agreement specifically provided that all representations were to survive any investigation made by or on behalf of the parties. Under such circumstances, it is clear that the Ross brothers should have affirmatively disclosed the complete free record situation.

■ In concluding that the Ross brothers had satisfied their duty to disclose, the district court also relied on evidence that Michael Curb, president of MGM Records, knew that some additional records were being distributed free of charge by the Ross brothers and that MGM and industry practice was to distribute some no-charge records beyond the three on 10, two on 10 standard. However, in light of the statements by Ross employees that free records were distributed on a three on 10, two on 10 basis, MGM was entitled to a full disclosure that large numbers of additional records were distributed free of charge. Because of the Ross brothers' failure to disclose the full extent of their record distribution practices, in violation of both Rule 10b–5 and their contractual obligations, we hold that MGM was entitled to rescission.[3]

## III.

MGM also argues that it was entitled to rescission on the ground of breach of warranty because 86% of the companies'

---

**3.** The Ross brothers argue without much force that MGM waived its right to rescind by paying dividends on the 12,500 shares it had distributed pursuant to the exchange agreement. We find nothing in such conduct to indicate that MGM intentionally abandoned or relinquished its right to rescind. Cf., Alsens American Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37, 118 N.E. 210 (1917).

receivables were not collected within six months of the closing date, 67% of the receivables having been extinguished by returns of records for credit. The district court held that the warranty assuring the collection of Ross receivables "within six months from the date hereof" ran from April 21, the date of the agreement, and not from October 8, the date of the closing. It also held that returns were not offsets within the meaning of the Ross warranty that the accounts were "subject to no offset" and were "fully collectible."

■ In view of section 8(a) of the agreement, which makes all warranties effective as if made on and as of the closing date, it is clear that contrary to the district court's opinion, the warranty as to the collection of receivables should also run from the closing date. The terms of the warranty do not indicate that it is to be an exception from the general rule enunciated in section 8(a). On the contrary, the business realities of the exchange required that MGM be assured that when it parted with its stock at the closing, the receivables it would be acquiring would be paid within a reasonably short time.

Since 67% of the receivables were not collected because they were extinguished by returns, which are expected, to a degree, in the record industry, we would not grant rescission on this ground without remanding to the district court for a determination of whether that figure was unreasonably high. However, in view of our holding that MGM is entitled to rescission on the ground that the Ross brothers failed to disclose the 70,000 no-charge records, such a remand is unnecessary.

### IV.

The district court granted the Ross brothers $200,000 in damages on the ground that MGM had breached its obligation under the loan agreement to supply the Ross companies with financing of up to $500,000. However, since the district court should have granted MGM's claim for rescission of the agreement, it should also have dismissed the Ross brothers' breach of contract claim.

The decision of the district court is reversed.