**PITTSBURGH COKE & CHEMICAL COMPANY, Plaintiff,**

v.

**Louis J. BOLLO, Defendant.**

No. 71 C 305.

United States District Court,
E. D. New York.

Oct. 18, 1976.

Cahill Gordon & Reindel by Paul W. Williams, Floyd Abrams, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison by Allan L. Blumstein, Anthony M. Radice, Howard F. Jaeckel, New York City, for defendant.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

This is an action by Pittsburgh Coke & Chemical Company ("PCC")[1] to recover from the defendant Louis J. Bollo ("Bollo") damages in the amount of $3,100,000, representing the larger portion of the consideration paid by PCC to him and other stockholders of Standard Aircraft Equipment Company ("Standard") to complete PCC's acquisition of a 97% controlling interest in

---

1. PCC, itself a subsidiary of the Hillman Company, is the successor in interest to its own subsidiary, First Grant Corporation, with whom the transactions in issue actually took place, hence the references to PCC as the transacting party. On June 30, 1972, PCC merged into Pittsburgh-Wilmington, Inc. and is now known as Wilmington Securities, Inc.

Standard in 1969 and 1970. The asserted grounds of liability are § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and diversity claims of breach of express warranty and common law fraud. The case was tried to the court without a jury and the following constitute the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

### Background Facts

Plaintiff PCC, prior to the time of the Standard acquisition, was a substantial diversified management investment company registered under the Investment Company Act of 1940. Commencing in 1964 it began an active program of conglomerate acquisitions, acquiring four wholly owned operating companies and significant stock holdings in several other affiliated and unaffiliated companies. As of December 3, 1968 PCC's net equity in operating companies and investments exceeded $56,000,000. DX A.

Standard began business life in 1933 at Roosevelt (Aviation) Field, Long Island, as a sole proprietorship of defendant Bollo. Its business then was primarily that of a repair facility for private aircraft, although it also served as a local distributor of aviation instruments and parts manufactured by pioneer aviation divisions of Bendix Corporation. After its first growth in distributor sales to the military during World War II, Standard was incorporated in 1947 with Bollo as 90% stockholder and began a postwar growth coinciding with the expansion of commercial and general aviation. At the end of 1966 Standard's annual total sales had climbed to $6,597,000, of which only 10% was attributable to repair services.

Although Standard had acquired some 100 distributorships by the 1960's, each representing distinct product lines, the bulk of its sales and profits were derived from selling the products of a group of manufacturer-suppliers to major airline customers (45%), fixed base operators and repair centers (40%), corporate aircraft operators (14%) and the military (1%). Those manufacturers were Bendix Aviation Corporation (through separate divisions), Whittaker Corporation, Goodyear Tire & Rubber Company, Champion Spark Plug, Sonotone and Pesco Products Division of Borg-Warner Corporation. For example, in 1966 their products accounted for approximately 5 million of Standard's 6.6 million sales in that year. And two of them, the Bendix group and Whittaker, accounted for 3.8 million of that total. All of Standard's distributorship agreements permitted the manufacturer to unilaterally alter the discount rate at any time and generally were terminable on as little as 30 days' notice. Additionally, the manufacturers often sold their products directly to the airline industry, thereby competing directly with distributors such as Standard.

Standard's business hinged on the willingness of manufacturers to continue to sell their products to Standard at a sufficient discount to allow it to earn a profit after operating expenses. Standard attempted to provide incentive for them to do so in several ways. The manufacturers were, obviously, interested in selling as much of their products as possible. The airline customers, in turn, were desirous of having a wide variety of parts immediately available for use at major points on their routes. The manufacturers, however, were either unwilling or unable to invest the additional capital needed to maintain large inventories at diverse geographic locations. Standard filled this gap by establishing distribution facilities, stocked with ample quantities of numerous items, at key points around the country, e. g., Garden City, New York (Pan Am overhaul base), Los Angeles, California and Kansas City, Missouri (TWA overhaul bases), Miami, Florida (Eastern Airlines overhaul base), and Atlanta, Georgia (Delta overhaul base). By continuously maintaining large inventories around the country, Standard not only satisfied its suppliers,[2] but also sustained good relations with its airline customers, who wanted their orders

---

2. Bollo testified that in the late 1950's, Scintilla Magneto, a Bendix division, cancelled Standard's distributorship because of lack of sufficient inventory of that division's products.

filled rapidly and who could obtain the same goods at the same price from either Standard's many competitors[3] or the manufacturers directly. The essence of Standard's business was aptly characterized by Bollo as having "the right part, in the right place, at the right time."

By the late 1960's, Standard's inventory consisted of some 50,000–60,000 different items, ranging in unit price from a nickel to $20,000, with most items (over 99%) costing under $500, and accounted for approximately 60% of its total assets. Each inventory item was maintained on a separate card, with sales and purchases manually posted to those cards on a daily basis. The sales history of any particular product could thus be readily gleaned from the inventory card. The 50,000–60,000 inventory cards were kept in open racks at Standard's headquarters in Garden City. By the end of 1968, the manual inventory system had been approximately 50% computerized (IBM punchcards) in order to tie in with the inventory system adopted by the airlines.

Standard sold both units and piece parts. Units, which comprised about 5% of Standard's total sales, are complete parts, e. g., generators, ready to go on an engine or airplane. Piece parts, which comprised the balance of Standard's sales, are essentially replacement or spare parts, such as brushes in the generators.

Standard's total annual sales for the years 1965–1967 were as follows:

1965—$5.9 million
1966—$6.6 million
1967—$7.8 million

Between 1961 and 1967, Standard's gross profit margin was steadily between 20% and 23%.

### PCC's 1967 Investment in Standard

PCC's original interest in Standard in 1967 appears to have coincided with PCC's acquisition in that year of a controlling interest in a supplemental airline. On July 31, 1967 PCC's wholly owned subsidiary, First Grant Corporation ("First Grant"), acquired American Flyers Airline Corporation as a 90% owned subsidiary. American Flyers, an air carrier certificated by the Civil Aeronautics Board, was authorized to operate charter passenger and cargo flights throughout the United States and to Canada, Mexico and the Caribbean and also charter passenger flights to Europe, Asia and Africa. In addition to turbo prop and jet aircraft it owned or intended to acquire, American Flyers, also leased Boeing jets from another First Grant subsidiary, Grant Aviation Leasing Corporation (87% owned). It would appear to have been PCC's intention, through American Flyers, to promote and develop a commercial airline business including transatlantic passenger charter flights using long-range jet aircraft. These, of course, would require aircraft maintenance and repair and the availability of repair parts.

In June 1967, shortly before concluding the American Flyers acquisition, PCC, through its same subsidiary First Grant, made its first investment in Standard. By agreement dated June 8, 1967, between Standard and Bollo, as sellers, and First Grant, as purchaser, PCC acquired a total of 84,000 shares of Standard common stock for $588,000 ($7 per share). DX V. Prior to the June 8 agreement, PCC had already purchased 23,000 shares of Standard on the open market[4] at a cost of $147,432 (approximately 6⅜ a share). As a result of these purchases and a year-end stock dividend of 5,349 shares, PCC at the beginning of 1968 held 25% of the outstanding shares of Standard.

Although PCC declined Bollo's invitation to be represented on Standard's board of directors, it appears to have been fully cog-

---

**3.** Standard's principal competitors were Van Dusen Aircraft Supply, Southwest Airmotive Corporation, Air Work Corporation and Pacific Airmotive Corporation.

**4.** These shares held by public stockholders were part of a public offering of 75,000 shares made by Standard in August 1959 to obtain additional working capital for its expanding business. DX T.

nizant of Standard's basic financial data over a considerable time period as well as its position in the field. The June 8, 1967 agreement recites (and no one has questioned) that PCC, prior to making its initial investment was supplied with financial statements (balance sheets, income statements and related notes) for each year dating back to December 31, 1961.[5] Moreover, Richard M. Johnston, then assistant to the president of PCC, who was involved in the investigation and negotiations for the 1967 agreement, made a comparison of Standard with other companies in the field, see n.3 *supra,* and personally discussed its business with Bollo at Standard's headquarters in Garden City, Long Island.[6] Indeed, as the calendar rolled into 1968—the boom year for conglomerate acquisitions—it is quite apparent that Johnston had already made a further analysis of Standard's operations for the first eight months of the year in comparison with its prior seven years' earnings when, on September 27, 1968, he confirmed to PCC the news that another company had held discussions with Bollo regarding a takeover. PX 10, DX F.

We now turn to the events, transactions and claims which gave rise to this action.

### PCC's Acquisition of Standard

There can be little question that the event which triggered PCC's virtually total acquisition of Standard was Johnston's news that Premier Industries of Cleveland had made a formal offer to Bollo to acquire his remaining 55% of Standard's shares in contemplation of making a tender offer to the minority stockholders, including PCC. As reported by Johnston, PX 10, Premier had retained White, Weld & Company to study the aviation market for possible acquisitions and Standard had been chosen.

Premier's offer for Bollo's stock was in the form of 4½% convertible preferred stock having an equivalent value of $12.50 a share. Public holders of Standard shares and PCC were to be offered a choice of cash or convertible preferred at an equivalent price of $15 a share. According to Johnston, Bollo was interested in knowing "if we would be interested in buying Standard and supplying the necessary aid." PX 10. The latter reference was to Bollo's fear that Premier would not be in a position to supply sufficient help to Standard because another recent major acquisition of Premier's was having difficulties.

PCC's reaction to the Premier offer was prompt. In October 1968 discussions were held between Bollo and PCC's chairman and president, Henry L. Hillman. Also in attendance were Putnam B. McDowell, a vice-president and director of PCC, and Johnston. Bollo offered to sell his stock for $16 a share, its then market quotation price. Hillman sought a lower price by 10–20%, based on what he considered an appropriate price-earnings ratio. Bollo rejected that offer and left the meeting believing that was the end of the matter. A few days later Johnston called and said PCC was willing to pay $16 and ready to go ahead with the deal.[7]

The deal between PCC and Bollo was embodied in a written agreement executed December 20, 1968, PX 2, which was identical in substantial part to the June 1967 agreement, DX V, with respect to the warranties and representations of Bollo upon which this action is based. The 1968 agreement provided in substance that PCC would first make a tender offer for the stock of Standard's public shareholders at $16 per share and thereafter Bollo would sell to PCC, at $16 per share, so much of his stock

---

5. It is noteworthy that these were warranted in the 1967 agreement to "have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved . . . [and] fairly present the financial position of Standard . . . and the results of operations for the periods indicated." DX V.

6. Bollo testified that all phases of Standard's business including inventory, "our biggest asset," were discussed with Johnston and Thomas Binger, then president of First Grant. Tr. 509.

7. This was Bollo's recollection. Tr. 585. Johnston believed there was "a handshake agreement at that meeting." Tr. 103.

as was required to make PCC the owner of 80% of Standard's shares. PCC also agreed to employ Bollo as president of Standard for five years at a salary of $65,000 per annum and, at his option, to purchase his remaining shares at a price formula which guaranteed him at least $12 per share. PCC also had the prior option to purchase such shares at the same price or terms offered to Bollo by third parties.

PCC's obligations under the agreement were conditioned upon its obtaining an exemption from the Securities and Exchange Commission (because of its investment company status) and either exemption or approval from the Civil Aeronautics Board (because of its American Flyers acquisition). To allow time for this, the closing date was originally set for no later than June 30, 1969. On December 31, 1968, pursuant to the agreement, PCC nonetheless went forward with a tender offer to stockholders other than Bollo. A total of 71,309 shares were tendered for which PCC eventually paid $1,140,944.

Due to delays in obtaining SEC and CAB clearances, The closing specified in the agreement did not take place until September 18, 1969. At that time PCC paid Bollo $2,740,832 for 171,302 additional shares needed to increase PCC's holdings in Standard to 80%. Bollo, for his part, delivered the certificate required by paragraph 6(d) of the agreement, which provided:

"(d) The representations and warranties contained in Paragraph 2 of this Agreement shall be true and correct as of the Closing Date, with the same force and effect as though they had been made at the Closing Date, and there shall have been delivered to Purchaser the certificate of Bollo, President of Standard, dated the Closing Date to such effect, . . ." PX 2.

In that certificate Bollo again warranted and represented that all financial state-

ments furnished to PCC through September 30, 1968,

". . . have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the period involved. All such statements fairly present the financial position of Standard as of the dates thereof and the results of operations for the periods indicated.

(f) Since December 31, 1967, there has been no material adverse change in the financial condition of the company as evidenced by most recent balance sheet information except that, as you know, earnings in 1969 have been reduced primarily to the investment in start up expenses of our Kansas City operation." PX 3.

It would appear that coincidental with the closing, a meeting of Standard's board of directors was held at which McDowell of PCC was elected chairman, Bollo was continued as president, and other PCC representatives were appointed vice-president and secretary. See DX D. In October 1970 Bollo resigned at PCC's request, his salary being paid until February 1971.[8]

For the year 1968 Standard's sales were 9.1 million, an increase of 17% over 1967 sales of 7.8 million, but net profits declined by $39,125. This decline was in substantial part attributable to a federal income tax surcharge. DX KK. In 1969 annual sales increased again to 9.27 million. PX 1. In 1970—characterized as the year of the "aviation recession"—sales dropped to 8.7 million, followed by a further drop in 1971 to 7.9 million. Id. In 1972, however, sales rose to 10.8 million, the highest in Standard's 39 year history. Id.

The relative profitability of these fluctuating sales figures was not disclosed in the evidence. Plaintiff's primary claim is that Standard's future profitability and growth had suffered severe setbacks because of ma-

---

8. Shortly prior to the requested resignation, Bollo had exercised his option under the December 20, 1968 contract to sell his remaining shares of Standard to PCC. Pursuant to the contract provision, PCC on August 4, 1970 paid him $948,504 for 79,042 shares ($12 per share), thereby increasing PCC's holdings in Standard to approximately 97 percent. PX 1, p. 2.

terial changes in major distributor relationships which Bollo had failed to disclose during the 1968 takeover negotiations and prior to the September 1969 closing. Had this information been made known, it is claimed, it "might well have discouraged" PCC from going forward with the deal, at least at the prices paid for the stock acquired under the 1968 agreement. To the specifics of PCC's claims we now turn.

### Events Before the 1968 Agreement

Essentially PCC claims that contrary to facts known to him, Bollo led it to believe that Standard was in a strong position to gain substantial new business selling parts for the so-called "second generation" or wide-bodied jet airliners, the Boeing 747, Lockheed 1011 and Douglas DC–10, when they came into use. Standard's largest suppliers of such parts were Whittaker Corporation and two divisions of Bendix Corporation, Navigation & Control Division ("Bendix N & C") and Energy Controls Division ("Bendix E & C"), which, as previously noted, collectively accounted for more than half Standard's distributor sales. Standard's sales margin and profits depended, of course, upon the discounts available from its suppliers. Whittaker extended Standard a discount which varied from 15% to 22% depending on the size of Standard's monthly orders. Bendix N & C had traditionally extended standard a 50% discount from list on items which Standard resold at a 40% discount from list, thereby realizing a gross profit of 16.7%. Bendix E & C's traditional discount to Standard was 60% from list on products which Standard resold at a 45% discount, thereby realizing a gross profit of 27.3%.

PCC charges that Bollo was aware as early as 1967 that his Whittaker distributorship was in jeopardy and that Whittaker

management was being urged to divert the business handled by Standard to Whittaker's own Aircraft Components Division ("ACD"), which sold Whittaker products directly to users such as the airlines. In support of its charge, PCC points to two internal memoranda of Whittaker surreptitiously obtained by Standard's Los Angeles branch representative. PX 12 and 13. Both were written by one Danks, an obviously ambitious subordinate desirous of increasing the importance of ACD but lacking the authority to effectuate his proposals. The earlier was dated January 6, 1967, months before PCC appeared on the scene, and the later memorandum, dated July 8, 1967, PX 13, appears to be only a rough draft of a proposal to his superior.

▇ Bollo acknowledged he had seen and discussed these memoranda about the time they were obtained but had concluded there was nothing Standard could do about Danks' hostile views. In view of Whittaker's uninterrupted relationship with Standard during 1967,[9] 1968 and 1969, and the ambiguous import of the memoranda, they cannot fairly be regarded as "facts" which ought to have been brought to PCC's attention in 1968 or clear notice to Bollo that he could not expect to supply parts when the air busses began operating.

On the contrary, Bollo's expectations were not without basis. In between the two Whittaker memoranda, Standard had received a letter dated March 15, 1967 from Bendix N & C. DX BB. The letter pointed out that Bendix, despite "very stiff competition", had succeeded in getting "about 50%" of its instrumentation on the Boeing 747 and estimated "our package is in excess of $60,000 per airplane." More importantly, the letter declared Bendix's "intention to have our distributors participate with Navigation & Control Division on the initial

---

9. That the relationship was not impaired by Danks' individual views is clearly manifest from the fact that on April 3, 1967 Whittaker and Standard entered into a new non-exclusive distributorship agreement. DX Y.

It is worthy of note, moreover, that despite Dank's evident desire to be rid of Standard as a competitor of ACD, he had acknowledged that "[i]n my contacts with the various airlines, I would like to point out that Standard Aircraft Equipment Company is considered by most air-

provisioning and handle all spare orders." [10] DX–BB, p. 2.

A year later, Bendix N & C was still raising the hopes of its distributors. In a letter to Standard dated April 1, 1968— some six months before the start of the 1968 negotiations with PCC—Bendix reported its progress "in winning a sizeable avionics package on the Boeing 747 and we hope to do the same on the SST and Airbus airplanes." PX 17. The news was not unmixed. Bendix also noted that "the commercial aircraft industry with its ever increasing competitive picture has created several financial and support problems for us." In consequence, Bendix advised, it would reduce its discount rate, effective May 1, 1968, to 42.5%, with the airline net at list less 40%, covering "all commercial end items" which included "initial provisioning as well as follow-on spares". The letter, however, continued: "We are encouraging all the airline customers to do their initial provisioning of end items spares through our distributors. We conservatively estimate on the 747 alone that there is a market potential from 1970 through 1975 of over $10,000,000." Id.

Bollo testified without contradiction that the reduced discount on "commercial end items" did not affect the bulk of Standard's N & C business, which was the sale of spare parts or "piece" items as distinguished from "end items" or units (e. g., an entire generator). He also pointed out a similar reduction had occurred when the Boeing 707 and BAC 111 first came into operation and equipment manufacturers sought to recapture their costs by passing part of them along to the distributors. After the initial provisioning period ended, Bollo testified, the discount rate returned to "normal".

The most serious event in the pre-contract period affecting Standard's future business prospects was a discount reduction announced by Bendix E & C on October 30, 1968. In a letter of that date, PX 20, Bendix advised that effective January 1, 1969 the discount on rotors, stators and linings would be reduced from 60% to 54% off list. Bollo conceded that those parts represented a substantial portion of Standard's airline wheel and brake business, estimating it at close to 60%.

The effect of the discount change was to reduce Standard's gross profit on the sale of such parts from 27.3% to 16.4%. The discount on all other E & C parts remained at the historical 60%. In the three-year period 1965–1967, Standard's sales of E & C parts aggregated $3,921,000. PX 1. For the three-year period 1968–1970, the overall total increased to $4,883,000. How much of these sales was affected by the discount reduction and its actual effect upon Standard's profitability was not shown.

*Events Before the September 1969 Closing*

Adverse developments affecting Standard's hopes of distributing parts for the wide-bodied jets followed rapidly upon the signing of the December 1968 agreement. In January 1969, Jerry Bollo, brother of defendant Bollo and senior vice-president of Standard,[11] visited Whittaker's California headquarters. While there he was informed that "in all probability, we [Standard] will not be handling either unit or spare part support business on these aircraft." PX 14. He was assured, however, "that our current jet program is secure for a minimum of two years." Id. He prepared a memorandum about this, PX 14, the contents of which he discussed with defendant Bollo.

On February 6, 1969 the foregoing information was partially confirmed in a telex message to Jerry Bollo from Danks of

lines to be one of the better distributors in the United States." PX 13.

10. "Initial provisioning" is the term used for the original supply of spare part equipment new aircraft must be provided with and maintain at locations along an airline's routes in order to obtain CAB certification of fitness of the aircraft for air travel.

"Spare orders" or "follow-up support" refer to subsequent need for replacement units and spare parts due to breakage or wearing of original units and initial spare parts.

11. Jerry Bollo was still employed in that capacity by PCC at the time of trial.

Whittaker's ACD division. PX 15. Standard was therein advised that "all initial provisioning for the 747 aircraft" would be accomplished through ACD. This telex was also discussed with defendant Bollo. Jerry Bollo testified he did not show either his memorandum or the telex, PX 14 and 15, to anyone at PCC, nor did he know anyone who did. He acknowledged, on cross-examination, however, that the information was no secret at Standard and that the mid-management group, a dozen people, knew of it in detail.

In April 1969 Standard's hopes for second generation jet business were dealt another blow. Bendix N & C, reversing its prior plans, wrote Bollo on April 11 advising that "for the 747, DC-10, and other new programs, we have decided that as of 1 May 1969 we will serve the airline aftermarket on a factory-direct basis rather than through our distributors." PX 23.[12] The N & C letter continued, however, that "aviation distributors have an important and effective role in serving our airline aftermarket, and . . . we look forward to continuing our distributor program for other products and aircraft." Id.[13]

Jerry Bollo testified that a direct result of Bendix N & C's change in plans was the cancellation of $725,000 in initial provisioning orders for Boeing 747 unit spares which Pan American World Airways had already placed with Standard. These orders had been issued to Standard on various dates between November 7, 1968 and February 20, 1969 and called for shipment by Standard on August 15, 1969. On May 9, 1969 Jerry Bollo returned them to Pan American "[i]n accord with instructions from Navigation & Control Division and our recent telephone conversation . . . ." PX 32.

On that same date, May 9, 1969, Standard held its annual meeting and a board of directors meeting, both attended by PCC's McDowell.[14] Despite the large size of the lost Pan American order, the brief minutes of the directors' meeting make no reference to it. DX-M. Nor is it mentioned in McDowell's contemporaneous and comprehensive memorandum of the discussions at those meetings, PX 8.[15]

---

12. Bendix N & C's stated reason for this change was the necessity for a close working relationship with the airlines due to the "three-year product warranties, five-year guaranteed MTFB programs, and ceilings on the cost of repair parts per flight hour" which N & C had offered on the "highly sophisticated flight-control equipment" it was providing for the Boeing 747 and Douglas DC-10. PX 23.

13. Bendix did in fact renew its Master Distributor Sales Agreement as of April 1, 1969, covering all divisions as per product and discount schedules attached. It is noteworthy that the schedule for Bendix Electric Power Division specified that the reduced discounts on 747 equipment "will revert back to our regular Discount Schedule" after all airlines "have completed initial provisioning." DX FF.

14. Aside from his meeting with Bollo in New York City during the October 1968 preliminary acquisition negotiations (with which he was not involved—Tr. 48), this was McDowell's second visit with Standard's management at its Garden City headquarters. On March 19, 1969 McDowell spent "less than a full day" becoming acquainted with Bollo and other people and the nature of the business operations, including that of Standair, Inc., the repair services subsidiary. This he viewed as his "first exposure to the business . . . through the management of Standard Aircraft." Tr. 51-52. He was also certain that "[p]rior to that time . . I had heard considerable information about Standard Aircraft from my own associates . . . Mr. Johnston, in particular." Tr. 52.

15. The question which arises is whether the lack of mention was the result of a continuing plan by Bollo to conceal unfavorable developments until the acquisition was finally consummated. This involves an assumption that the failure to fulfill the Pan American order represented a financial loss to Standard. Such an assumption is incompatible with Jerry Bollo's testimony on PCC's direct case. Tr. 232. According to him, the order called for initial provisioning units which could not have been profitably provided by Standard at the Bendix N & C reduced discount rate which had taken effect May 1, 1968. See PX 17. That reduction was announced some six months *before* PCC became interested in acquiring Standard.

Of more relevance to the issues here is Jerry Bollo's related testimony that Pan American's request for return of the orders signalled to defendant Bollo "that the whole support program on spare parts for the 747 was now a thing of the past; before we got started it was stopped." Tr. 232.

The directors' minutes reflect that Standard's annual report was discussed. This presumably involved a review of the annual audit report covering operations for 1968 as prepared by the company's outside accountants. DX–KK. The report reflected that although sales increased by 1.3 million over 1967, net profit declined by $39,125 due to increases in expenses and a 10 percent Federal income tax surcharge. Also discussed were first quarter earnings for 1969, which McDowell's memorandum notes "were off substantially from last year's $83,000 after taxes to $45,700 on slightly increased sales." PX 8.[16]

What PCC particularly points to in support of its claims on non-disclosure and affirmative misrepresentation on Bollo's part is the following passage in McDowell's memorandum:

> Someone in the meeting estimated that when the 747's *go into operation,* the amount of Bendix and Whittaker equipment on these airplanes *may* result in annual sales volume of $250,000–300,000 per 747 for Standard Aircraft. Whether this applies to all 747's or only to those in certain areas was not made clear. The point is that Standard *feels* that it is in an excellent position on the 747 program. (PX 8, p. 3; emphasis supplied).

Following these meetings McDowell on May 14, 1969 wrote Bollo requesting financial statements used by management for the year 1968 and for the first quarter of 1969, as well as the regular monthly financial reports thereafter. DX–II. His stated reason for the request was:

> We would like to see these in enough depth to begin to get a feel of the relative profitability of the different branches and parts of the business, and so that our accounting people can start their thinking in connection with consolidation

of the financial statements. After we have had a chance to review these, we will want to send down two of our men to become more familiar with your method of reporting and accounting.

Bollo appears to have provided the desired information. See DX–JJ.

In July 1969 McDowell sent his assistant for planning and control, Rodney L. Bonar, to Standard's Garden City headquarters. Well trained in business administration, Bonar's overall function was to analyze profit variables of PCC subsidiaries as directed by McDowell. His assignment at Standard was "to examine the company to determine the critical variables . . . profit variables, to find out what we should be watching or examining as to the profitability of that company." Tr. 118. His previous acquaintance with Standard's business consisted of an examination at PCC in "the fall of '68 . . . November, December" of financial analyses which McDowell had received from Johnston, to "see if any problems, or red flags . . . showed up, and bring them to [McDowell's] attention." He saw none at that time. Tr. 117.

Bonar spent a day at Standard during which he spoke to Bollo on four occasions: first, before interviewing J. E. Rushia, vice-president for material; second, before interviewing S. Fronckwicz, vice-president for production; third, before interviewing Peter Bollo, vice-president of Standix, Inc., the Standard subsidiary which disposed of written-off inventory and resold used or surplus units and parts acquired from other sources; and fourth, when Bollo drove Bonar to the airport to return to Pittsburgh. The results of Bonar's discussions and observations "on the operations at Standard" are fully set forth in a five page memorandum he prepared for McDowell promptly upon his return. PX 9. It covers manage-

16. It is also clear from McDowell's memorandum, PX 8, that the availability of PCC's American Flyers airline subsidiary as a customer for Standard's repair and supply services was very much in mind at the May 9 meeting. See p. 912, *supra.* In response to a question as to whether CAB regulations might interfere, McDowell promptly reassured Bollo by letter of May 14, 1969, that "prospects for your doing business with American Flyers Airline may be better than I supposed" in that a limitation of $100,000 related only to a CAB reporting requirement and "is not a limitation on the amount of business that you can do with American Flyers." DX II.

ment organization, branch and subsidiary sales, inventory policies and control, warehousing, and the inventory and financial impact on Standard of "[t]he company's intention . . . to increase sales to general aviation". PX 9, p. 2.[17]

On the subject of inventory policies and control, after noting that "[t]he final decisions and important decisions are really made by J. Bollo and L. Bollo in concert", the Bonar memorandum states:

Standard's inventory "write-off policy" requires that if an inventory item has no sales or inquiries within 2 years the inventory is written off to zero. The item stays at zero value with Standard for another 2 years after being written off. At the expiration of the 2 year period if no sales occur, it is donated to Standix for resale. Current accounting practice is to reserve $4,000 a month or $48,000 a year for inventory write-offs. This is roughly 1.4% of year end 1968 $ inventories. (PX 9, p. 2).

The quoted paragraph is relied on by PCC as the basis for additional claims of misrepresentation and breach of warranty by Bollo, for which it seeks recovery of at least $381,982 in asserted damages as part of its general damage claim.[18] Simply stated, PCC's position is that Bollo represented to Bonar that Standard consistently followed a policy of writing off *each year* the cost or market value (whichever was lower) of inventory items which had remained unsold for a two-year period. The parties have stipulated that this was not in fact done, PX 1, ¶ 4.[19] PCC contends that the effect of this failure to write-off "dead stock" was twofold: (1) it resulted in an over-statement of pre-tax income in the years 1965–

1968 thereby inflating the price paid by PCC for Standard's stock even at the price/earnings ratio recommended by defendant's expert as an index of its value; and (2) it caused an overstatement by some 10 percent of the true value of Standard's inventory acquired by PCC.

Aside from the parties' stipulation, PX 1, n. 16, *supra*, the evidence on the subject of inventory write-off policy was both conflicting and confusing. More will be said about the conflicts in evidence later. Suffice it to say for now that McDowell testified he relied on Bonar's above-quoted paragraph as assurance that Standard "had a regular process for adjusting for slow-moving or obsolete inventory", Tr. 40, but later learned from a 1970 audit conducted by Price, Waterhouse, PCC's own accountants, that Standard would have to write off "a substantial amount of obsolete and/or slow moving inventory . . . in excess of a million dollars" over a period of two or three years. Tr. 64–5.

On September 10, 1969—about a week prior to the closing—Bonar visited Standard again for the purpose of reviewing and discussing estimates of "preliminary sales and earnings forecasts" which McDowell had requested Bollo to have ready. DX D. These forecasts were to cover

1. Anticipated sales and earnings on the new major sales such as Eastern, United, NARCO, etc. This is for the purpose of backing up our investment in or loan of added working capital.

2. An estimate of sales and earnings for the full year 1969.

3. A preliminary look at 1970 sales and earnings. This will provide the

---

17. "General aviation" is the term used to describe the aircraft parts and supplies market exclusive of the commercial airlines; *i. e.*, fixed base operators, corporate and private aircraft, the military and, as Bollo put it, "the odds and ends." General aviation accounted for 35–40 percent of the company's sales revenue and the repair business about 10 percent. Tr. 481–82.

18. PCC Post-Trial Memorandum at 90.

19. The parties stipulated that write-offs were made only as indicated in the following tabulation (PX 1, ¶ 4):

| Year | Amount |
| --- | --- |
| 1962 | $10,000.03 |
| 1963 | None |
| 1964 | 21,600.02 |
| 1965 | 60,100.00 |
| 1966 | None |
| 1967 | 45,285.15 |
| 1968 | None |

framework for developing a formal budget for 1970 as well as for preliminary cash planning for PC&C. (DX D).

Bonar's three page memorandum covering that visit, dated September 11, DX G, sets forth the actual and estimated sales of Standard for the first and second half of 1969, net income after taxes and its percentage relationship to net sales. It discloses that although sales were expected to increase over 1968, net income after taxes would decrease about 60 percent. Also listed were anticipated sales in 1970 to current customers and specified *new* customers, indicating 747 business where applicable. Standard's estimated cash needs for inventory required for the specified anticipated sales and refinancing of existing bank debt were itemized. And finally, the memorandum provided a summary analysis of the impact of the new sales contracts in terms of projected net sales, inventory, inventory turnover and net income after taxes for the year 1970 and one to two years thereafter.

Except for the assertedly undisclosed Bendix discount reductions and the freeze-out on distributor sales of Whittaker-Bendix second generation jet parts, the foregoing capsulizes the essential information PCC had at the time of closing on September 18, 1969, regarding Standard's business operations, its existing and potential suppliers and customers, and its profitability and financial problems. McDowell readily conceded that prior to the closing no one at PCC had reported any difficulty in having questions answered by Standard personnel. Both he and Johnston also agreed that Bollo had never refused to answer their questions or supply any documents they requested, or prevented visiting PCC representatives from ascertaining whatever they wanted to know.

*Post-Closing Events*

The facts and circumstances relating to the claims in controversy would not be complete without mention of a chain of post-closing events which in all likelihood provoked this litigation and brought about Bollo's hastened resignation as president of Standard in October 1970. The first occurred on July 27, 1970, when Whittaker notified Standard that their distributorship agreement would be cancelled completely, effective February 1, 1971. DX K.[20] The second event was a notice from Bendix, dated September 1, 1970, cancelling as to all distributors its "product lines manufactured for transport category aircraft," effective October 1, 1970. DX N. Bendix N & C and E & D Division products were cancelled in entirety. Other divisions were left available to distributors; i. e., "where [their] products have significant general-aviation applications as well as airline usage, it is our desire you continue to handle these along with other general-aviation products." DX N. The third event, already adverted to, was the Price, Waterhouse audit received in the fall of 1970, which alerted McDowell to the need for substantial inventory writeoffs. All these events, it should be noted, occurred in a period which PCC's own expert witness, William Carolla, referred to as the "aviation recession." Tr. 440.[21]

McDowell testified that not until after the closing did he become aware that Standard's contracts with its suppliers were cancellable on short notice, Tr. 63, although he conceded knowing that a cancellation clause is common to most distributor contracts. Tr. 83. He further acknowledged that in a deposition taken almost two years earlier, he had testified he thought it was not until the Bendix cancellation that he became "knowledgeable about the form of the con-

---

**20.** On September 24, 1970 Whittaker agreed to extend the distributorship through December 31, 1971, but at an unprofitable reduced discount rate. DX L; Tr. 270.

**21.** Carolla, a consultant in the aviation industry, had been an executive for some 20 years in companies which distributed aircraft parts, supplies and equipment, and was president of Van Dusen Aircraft Supply, the largest in the field, until he resigned in December 1973. Tr. 368–69.

tract, the cancellation provisions." Tr. 62.[22] Bonar, his assistant, testified he did not ask to see Standard's supplier contracts; but admitted he had stated on pre-trial deposition that he inquired at Standard during his July 1969 visit as to whether the contracts were terminable at the decision of the supplier and was told they were. Tr. 129–30. McDowell admitted that Bonar never reported this to him and that he had never asked Bonar why he had not. Tr. 64.[23]

### The Merits of PCC's Claims

#### Securities Fraud

PCC's Rule 10b–5 claim of concealment and misrepresentation rests substantially on the testimony of McDowell and Johnston. Both testified they had not been informed or had known prior to the closing that Bendix N & C and E & C had reduced their distributor discounts or that Whittaker and Bendix would not use distributors in selling repair parts for the "second generation" jets. PCC contends that Bollo was fully aware of these "facts," deliberately concealed them, continued to represent optimistic prospects for 747 jet business and thereby caused PCC to conclude the acquisition of Standard "on the basis of false and misleading statements and material non-disclosures." [24]

Bollo testified—with some manifest inconclusiveness of recollection—that PCC was "kept informed" of all such developments. PCC urges that Bollo's vagueness of recollection and inconsistencies between his deposition and trial testimony make him unworthy of belief, indeed a liar. If he is to be believed, says PCC, then its witnesses must be held to have deliberately lied. Granted that some of the testimony was conflicting, the evidence as a whole does not warrant the suggested "either/or" approach with respect to credibility.

Without branding Bollo as unworthy of belief, the court accepts McDowell's and Johnston's testimony that they were not aware of the Bendix N & C letter of April 1, 1968, or the Bendix E & C letter of October 30, 1968, PX 20, pp. 915–916, *supra*, or the reductions in distributor's discount rates those letters effected. Obviously the April letter, received almost six months before the proposal that PCC acquire Standard was even discussed, was hardly likely to be a reasonable subject of PCC interest. This is especially so when the discount reduction had no substantial impact on Standard's business of selling "piece" parts rather than units to which the lower rate applied.

The October letter arrived shortly after the "handshake deal" but obviously prior to the signing of the acquisition contract on December 20, 1968. It lowered the distributors' discount on certain parts to 54 percent, down from 60 percent, effective January 1, 1969. Since its effect would be to reduce profit margin on wheel and brake parts—which Bollo estimated to be about 60 percent of the Bendix E & C product line handled by Standard—it represented an arguably material development because of its impact on future earnings. Its claimed significance as an undisclosed fact vanishes, however, in light of PCC's microscopic scrutiny of Standard's profit margins, sales and earnings—actual and projected—over the ten year period 1961–1970. PX 10, DX F and G.

There is not the slightest doubt that the financial results of Standard's business operations—the only material information of

---

**22.** A note to McDowell from Fred Kirby, who in 1970 had succeeded to Bonar's role, strongly suggests that PCC was then looking into Standard's rights upon termination by Bendix. DX FF. The note is attached to a copy of the complete Bendix "Master Distributor Sales Agreement," n. 13, *supra*, apparently obtained from PCC during discovery.

**23.** Bonar did not include this information in his memorandum to McDowell, PX 9, being of the impression that the legal relationships were not important "in this industry." Tr. 131. He derived the impression from Bollo's statements that relationships with suppliers such as Bendix and Whittaker were "good." Tr. 132. This, of course, was not a representation that the contracts would never be cancelled.

**24.** PCC Post-Trial Memorandum at 21.

interest to PCC—were an open book. Indeed, before McDowell signed the December contract, he made sure there were no "red flags" by having Bonar review Johnston's financial analyses, p. 918, *supra.* Surveillance of Standard's financial health and progress became even more intensive as McDowell took hold and the day of closing approached. .PX 8, DX II, DX JJ, PX 9, DX D, DX G. Prior to the closing, PCC was well aware that even though Standard's sales in 1969 were likely to increase over 1968—which they did, PX 1, ¶ 7—its net income after taxes for 1969 would decrease about 60 percent. See pp. 919–920, *supra,* and DX G. PCC apparently did not question this substantial decline and went ahead with the closing. The inference is inescapable that it either knew the reasons [25] or considered them immaterial to its ultimate objectives in completing the acquisition.

Turning now to the claimed evidence of misrepresentation in the pre-contract period, a similar lack of substance is manifest. The genesis of the claim is a paragraph quoted in the margin [26] found in Johnston's memorandum of September 27, 1968. PX 10. As previously noted, p. 913, *supra,* it was that memorandum which undoubtedly accelerated PCC's action to complete the acquisition of Standard before another conglomerate took it over. The only statements in that paragraph were Johnston's, not Bollo's. Johnston admitted he never sent a copy to Bollo. Bollo therefore had no opportunity to correct it.[27]

The gist of the misrepresentation claim is that Bollo *deceived* Johnston and later McDowell into believing that Standard could expect continued sales growth supplying Whittaker and Bendix parts for the Boeing 747 and other wide-bodied jets when they came into use. There is nothing in the Johnston memorandum to support such a claim or in his testimony at trial. The optimistic statements properly attributable to Bollo as of September 25, 1968, were factually well-founded in view of the Bendix N & C April letter reassuring Standard that airline customers would be encouraged "to do their initial provisioning of end items spares through our distributors" and that "on the 747 alone . . . there is a market potential from 1970 through 1975 of over $10,000,000." PX 17. As regards Standard's relationship with Whittaker, there is no question that in April 1967

25. Certainly the reduced discount on Bendix E & C brake and wheel parts (rotors, stators and linings) effective January 1, 1969, would have been one of the reasons for the decline in earnings for that year even though Standard was awarded a substantial two-year contract to handle Eastern Airlines' wheel and brake business. DX B and C. It is thus impossible to believe PCC was unaware that the expected net profit on that new business, as computed by Bonar, DX G, was at the then current reduced Bendix discount rate.

26. "The future looks most encouraging to Lou. The immediate prospect among the airline customers is the 747, which is loaded with Bendix equipment. Standard has traditionally had a strong position with Bendix. Included among the parts are wheels and brakes, all the electrical system, the autopilots and 50% of the instrumentation. Lou is confident that he will obtain much of the original ordering for airline provisions, and he has already received assurance from Pan American that they will handle all brakes and wheels through him. Standard has been assigned as the fourth distributor for general aviation radios manufactured by Bendix. Bendix has informed him that he should expect a minimum of $1 million sales in the first year. No announcement has been made yet concerning parts for the Lockheed and Douglas air busses, but this is forthcoming in the next year. Whittaker Corporation continues to be the largest supplier, and volume continues to rise dramatically and now approaches $1.8 million annually. These controls will appear on the big airplanes in quantities just as they are on the first generation jets. Standard remains exclusive distributor, and Lou sees no change in this situation."

27. Johnston's misstatements were (1) that Standard had been appointed as "fourth distributor" for Bendix general aviation radios, (2) that Standard remains "exclusive distributor" for Whittaker, and (3) that Bendix had gotten its "autopilots" on the 747. Standard did not handle Bendix radios and was never an "exclusive" distributor for Whittaker, although it was the only outside distributor. Whittaker had its own divisional distributing organization, ACD, which sold directly to airline customers in competition with Standard. Bendix, moreover, had lost out in trying to get its autopilot on the 747s. Tr. 544–46.

Whittaker had renewed the distributor agreement, DX V, in spite of its employee Danks' competitive animus toward Standard. The internal memoranda he authored in early 1967 have already been rejected as any basis for a claim of misrepresentation here. See pp. 915–916, *supra.* Certainly they were hardly *new* information that required disclosure when Bollo informed Johnston in September 1968 of Standard's expectations of additional business from Bendix and Whittaker after the jumbo jets went into service.

What PCC really claims is that developments occurring *after* it made its commitment to acquire Standard imposed a duty of disclosure under Rule 10b–5. The commitment to Bollo was made on December 20, 1968, when PCC executed the agreement, PX 2, and thereby agreed to purchase shares of Standard held by public stockholders and so much of Bollo's stock as would give PCC 80 percent ownership. PCC concedes that its commitment to the public shareholders was complete on December 31, 1968 when it made its tender offer.[28]

For purposes of a Rule 10b–5 claim, events occurring after the commitment to purchase stock has been made are irrelevant. Issues of non-disclosure, misrepresentation, materiality and reliance are to be determined by the situation and knowledge of the parties at the time they committed themselves, and not on the basis of subsequent events, even though they occur prior to "the formal closing date when the delivery and payment are formally completed and cleared." *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir. 1972).

PCC's attempted distinction of this case from *Radiation Dynamics, supra,* does not postpone the "commitment" date to the time of closing on September 18, 1969. Granted that PCC's "obligation . . . to purchase the Balance of 80% of Standard Stock is subject to fulfillment of each of the following conditions," PX 2, ¶ 6, it is nonetheless plain that "in the classical contractual sense, there was a meeting of the minds of the parties" on December 20, 1968, marking "the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Radiation Dynamics, supra,* at 891.

Nor was the time of commitment affected by the fact that one of the "conditions" imposed on Bollo read as follows:

(d) The representations and warranties contained in Paragraph 2 of this Agreement shall be true and correct as of the Closing Date, with the same force and effect as though they had been made at the Closing Date. . . . (PX 2, ¶ 6).

The "representations and warranties" principally relied on by PCC are the following:

(e) . . . all such financial statements [of Standard] have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved. . . . (PX 2, ¶ 2),

and

(f) Since December 31, 1967, there has been no material adverse change in the financial condition or in the business or operations of Standard. Id.

The foregoing "representations" were obviously made on the basis of Bollo's knowledge as of December 20, 1968. Rule 10b–5 liability could only attach if on that date the material facts incorporated in the representations were untrue or misleadingly incomplete to Bollo's knowledge at that time and were relied on by PCC in making its commitment to acquire control of Standard.

As already noted, there is no substantial evidence of material omission or misrepresentation on Bollo's part in the pre-commitment period to support PCC's Rule 10b–5 claim. At best its claim amounts to the assertion that Bollo's intimate knowledge of Standard's affairs required him to predict for PCC that Whittaker and Bendix's N & C and E & C Divisions would in 1969 decide not to use distributors for the sale of repair parts for the second genera-

---

**28.** PCC Post-Trial Memorandum at 63.

tion jets; that in 1970 the "aviation recession" would occur; and that Whittaker and Bendix, in their own self-interest, would then terminate Standard's distributor agreements for their commercial airline products. Rule 10b–5, however, does not place such an obligation on Bollo. It requires "nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders." *S.E.C. v. Texas Gulf Sulphur,* 401 F.2d 833, 848–49 (2d Cir. 1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Here, PCC—itself the owner of a commercial airline, a sophisticated investor and an "insider" of Standard—had unrestricted access to Standard's basic business data upon which its investment decision was manifestly based. That PCC availed itself of such access to the extent considered pertinent is amply shown by the evidence.[29] Once the basic data was disclosed Bollo was under no further duty to anticipate PCC's interest in matters which did not assume importance until this action was commenced in March 1971.

*Common Law Fraud*

The gist of PCC's fraud claim is that Bollo permitted PCC to go through with closing the purchase of Standard knowing it was acting under a mistaken belief as to material facts induced by him. Those "facts" according to PCC were essentially (1) that Standard's "good" relationships with its three major suppliers—Whittaker and Bendix N & C and E & C—could be

expected to lead to increased growth by way of sales of repair parts for the second generation jets; and (2) that Standard wrote off "deadstock" inventory each year in accordance with generally accepted accounting principles. PCC claims these "facts" were untrue and known to be so by Bollo but not by PCC, which relied on them to its damage.

▇ To prove a claim of fraud it is requisite to show (1) representation, (2) falsity, (3) intent to deceive, (4) deception, and (5) injury. PCC concedes that these requirements are if anything more rigorous than the findings required for a Rule 10b–5 claim.[30] And indeed they are, for it is settled under controlling New York law that the evidence of fraud "must be clear and convincing and the inference of fraud unequivocal." *Manchel v. Kasdan,* 286 App. Div. 483, 144 N.Y.S.2d 694 (1st Dept. 1955), *affd.,* 1 N.Y.2d 734, 151 N.Y.S.2d 940, 134 N.E.2d 687.

In support of its fraud claim PCC relied chiefly on testimony of McDowell and Bonar and their contemporaneous memoranda concerning events which occurred in 1969 prior to the closing. McDowell disclaimed any knowledge that Whittaker and Bendix N & C in February and April, respectively, had already notified Standard of their decision to deal directly with the airlines and not through distributors in supplying repair parts for the second generation jets. PX 15, PX 23, pp. 916–918 *supra.* As strong evidence of the asserted deception practiced upon it, PCC points to McDowell's memorandum summarizing the discussions at the May 9 directors' meeting, in which he

---

**29.** PCC counsel has called the court's attention to *Metro–Goldwyn–Mayer, Inc. v. Ross,* 509 F.2d 930, 933 (2d Cir. 1975), which held that the duty to disclose "is not discharged merely by giving the purchaser access to company records and letting him piece together the material facts if he can." While that rule is unquestionably a salutary one, it has no application here. In that case Ross affirmatively misrepresented to MGM the number of free musical records it had given the trade, a material fact which substantially altered Ross' *existing* financial worth. In granting MGM rescission of its acquisition of Ross, the court held that under Rule 10b–5, MGM was entitled to a full

disclosure regarding the free records and that Ross' obligation could not be shifted to MGM's auditors who had been provided with inventory cards which, if explained and interpreted, could have revealed the discrepancy. Here, PCC is not really complaining about non-disclosure of Standard's *existing* business or financial picture but rather its failure to live up to the future sales growth prospects Bollo assertedly predicted for it and to write off inventory according to PCC's understanding of Standard's procedure.

**30.** PCC Post-Trial Memorandum at 91.

reported Standard's feeling "that it is in an excellent position on the 747 program." PX 8, p. 918 *supra.* Bonar, who visited Standard in July 1969 to examine "the profitability of that company," pp. 918–919 *supra,* also testified to conversations with Bollo which fostered the impression that Standard's relationship with Whittaker and Bendix continued to be "good." Tr. 131.

PCC contends that far from being good, Standard's relationship with its two major suppliers was getting worse; that Bollo knew the Whittaker-Bendix notices portended declining sales, not growth, since the introduction of the second generation jets would decrease the need for repair parts on the 707s and older aircraft which Standard serviced; and that Bollo nonetheless kept reporting favorable developments, *e. g.,* the August 1969 Eastern and United Airlines orders, DX C, while concealing "material adverse changes" in Standard's business in order to insure that PCC would close the acquisition.

Although Standard's hope for increased sales growth when the big jets began service was undoubtedly a frequent subject of discussion with PCC officials, there is no convincing evidence of fraudulent representation on Bollo's part or that PCC was deceived into consummating the acquisition. The dismal prospects portrayed by PCC's broad strokes fade considerably when the evidence it relies on is closely examined in context with other facts.

For example, the Whittaker telex in February 1969, PX 15, which removed "initial provisioning for the 747 aircraft" from Standard's future reach, could not have been a surprise to PCC. McDowell acknowledged he was aware prior to the closing of "the possibility that the initial stocking might be performed by the manufactur-

ers." Tr. 36. Such a concession is fatal to any claim that PCC was induced to complete the acquisition by false representations of Bollo that Standard could count on increased sales supplying parts for the big jets. Those aircraft, still in the process of manufacture in 1969, were almost a year away from delivery to airline' customers.[31] It was a matter of common knowledge that the big jets represented an enormous outlay of capital for the airlines and that their economic feasibility had yet to be tested. As the Bendix letter of April 11, 1969, PX 23, n. 10 *supra,* plainly indicates, the airlines had prudently exacted from the manufacturers "such assurances as three-year product warranties . . . and ceilings on the cost of repair parts per flight hour." PCC, as the owner of a commercial airline, could not have been unaware of these widely known industry developments and of their probable impact upon the role of distributors. Indeed, PCC's alacrity in gathering in Standard's publicly held shares strengthens the conclusion that other factors apparent from the evidence induced its investment decisions, not the expectation of future "pie in the sky" as now claimed.

In March 1969, PCC went ahead and paid over one million dollars to Standard's public stockholders for their deposited stock, although it was not then obligated to do so since its tender offer expressly conditioned purchase and payment on receipt of C.A.B. approval. PX 1, ¶ 2; DX MM, p. 1. That approval was not forthcoming until several months later. Obviously, if approval had been denied, PCC could not have asked for its million dollars back. The inference is inescapable that PCC, acting in accord with its own stated investment objectives, was content to make a further substantial investment in Standard, even if it could not complete the acquisition of Bollo's stock.[32]

---

31. The court judicially notices the fact that the Boeing 747s did not enter service until January and February 1970 (Pan American and TWA) and deliveries to airlines extended into the mid-70's. See *Aviation Daily,* August 3, 1976, p. 181.

32. These investment objectives were declared in an offering circular PCC sent to its own stockholders on or about June 24, 1969. DX A. There it stated its "primary investment objective . . . is to seek long term appreciation in the value of the securities in which it invests with income being a secondary objective." DX A, p. 32. PCC also announced its intention "to generally confine its investments to a limited number of situations in which its interests will constitute control or will be large enough to

PCC's further suggestion, through Johnston's testimony, that the $16 per share it agreed to pay was a "premium" based on Standard's anticipated earnings growth and not its current earnings evaluation is not in accord with the market facts. In December 1968 when the agreement was signed, Standard's stock was selling in the over-the-counter market at $16 per share, or 23.5 times its earnings. DX NN. In or about September, Premier Industries had offered to pay $15 cash to Standard public stockholders, p. 913 *supra*. PCC could hardly have offered less and the $1.00 it added was clearly designed to induce a favorable response to its tender .offer. Nor was that price a "premium" for Bollo's control stock over the $12.50 in convertible debentures Premier had offered him. PCC actually . acquired a total of 434,002 of Standard's shares (97%) for $5,565,708, PX 1, ¶¶ 1 and 2, which averages out to $12.75 a share, a clear indication that Johnston had priced the deal for PCC with fair precision on the basis of Standard's earnings history and not on any anticipated earnings growth. DX F.

■ PCC's claim of pre-closing fraud on Bollo's part is also not aided by the statements attributed by McDowell to "someone" at the May 9, 1969 directors' meeting, PX 8, p. 918 *supra*. Assuming the accuracy of the statements made, they clearly are not representations of fact. McDowell was unable to recall who made the statements, Tr. 53, and recognized their ambiguity in his report. Even assuming Bollo was present and heard them made, an unequivocal inference of fraud could hardly be drawn from their context. Indeed, if McDowell's memorandum proves anything, it is that "potential new business" of Standard was recorded by him with specificity and qualified by Bollo's reservation that he

did not "expect to get all of this business." PX 8, p. 3. It was McDowell's conclusion that "[t]hese figures do indicate the likelihood of substantial growth," not Bollo's. Id.

Furthermore, conspicuously absent from McDowell's list is the $725,000 Pan American. order for Boeing 747 unit spares, p. 917 *supra*. Standard's receipt of the order had been previously reported to PCC. It could not be handled because of the Bendix N & C decision to deal directly with Pan American and the other airlines. The obvious conclusion is that McDowell omitted it from his list because he was aware that big jet business would not be available to Standard and that its need for future additional working capital would be limited to the potential new business he specified.[33] Indeed, McDowell's detailed review of Standard's branch operations and business prospects is the most convincing evidence that nothing material was misrepresented or concealed from PCC. PX 8.

■ In sum, far from proving fraud, the facts and circumstances developed in the evidence establish the absence of any material non-disclosures or misrepresentations of fact. It also clearly appears that PCC was the active, sophisticated seeker of investment opportunities; that in acquiring Standard it acted in accordance with well-defined long range investment objectives; that PCC's representatives were men of business skill and acumen well able to deal with Bollo, who took full advantage of the protracted opportunity they had to examine the financial status of Standard prior to closing the deal; and that the acquisition was consummated on the basis of PCC's own assessment of Standard and its compatibility with PCC's entry into the airline

---

enable it to exercise some influence on the management of the companies involved." Id.

**33.** A substantial amount of that new business was in fact gained and contributed to Standard's recovery in 1972 after the 1970–71 "aviation recession" downturn. DX DD and EE, PX 1, ¶ 7. Moreover, Bendix did not entirely exclude Standard (or other distributors) from "an important and effective role in serving our

airline aftermarket . . . ." PX' 23, p. 19, *supra*. And at least one Bendix division included in the April 1, 1969 renewed Master Distributor Sales Agreement referred to discount rates on 747 equipment. See n. 13 *supra*. PCC has in fact stipulated that four Bendix divisions continued dealing with Standard through 1971 and three of them through 1972, albeit in reduced dollar volume. PX 1, ¶ 7.

business and not in reliance upon the matters alleged in this suit. See *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir. 1975), holding that in a case such as this, where both misrepresentations and material omissions are alleged, a plaintiff must show both materiality and reliance—a burden PCC did not meet here.

There remains for consideration the second branch of PCC's fraud claim—that Bollo misrepresented Standard's inventory write-off policy thereby causing PCC to sustain substantial damage. That damage is alleged to be dual in nature: an over-valuation of the inventory of parts PCC acquired and a consequent inflation of Standard's earnings, resulting in an over-pricing of Standard's stock acquired by PCC both from Bollo and the public stockholders who tendered their shares.

As previously noted, p. 919 *supra*, this claim is based on Bonar's written statement of Standard's inventory "write-off policy," PX 9, which Bonar testified was given him by Bollo. Tr. 120. Bollo denied that Standard used a two-year write-off rule or that he had stated the policy attributed to him by Bonar. Tr. 605–7. There was also controversy over what was meant by "deadstock" as distinguished from items not sold for a period of two years.

J. E. Rushia, Standard's vice-president for materiel for some 25 years and still in that position under PCC management, testified on PCC's direct case as to inventory policy. There is no question that he was "the inventory man" but his testimony contributed little to resolving the conflict between Bonar and Bollo. He did make clear that "deadstock" encompassed obsolescent items and those which had to be discarded as directed by C.A.B. bulletins. Such items were withdrawn from inventory and written off annually. What their write-off value was does not appear. Otherwise his testimony confirmed the parties' stipulation, n. 19 *supra*, that in the period 1962–1968 four write-offs aggregating $137,000 were made. His description of the procedure reflected an arbitrary dollar limitation as dictated by Bollo and Rushia's own experience in deciding which items ought to be cleaned out and donated to the Standix subsidiary for possible resale.

Bonar's memorandum does not identify Bollo as the author of the stated policy and it is not possible to infer the scienter requisite for a claim of fraud. Standard was not a large company and prided its reputation for having "the right part at the right place at the right time." A portion of the inventory consisted of so-called "insurance" items—parts infrequently or rarely required but productive of goodwill when available to customers who needed such a part quickly and could not obtain it from the manufacturers. The parts it sold were not perishable items (except for deadstock) and it was therefore not unreasonable to retain them in inventory for longer periods than two years based upon the experience of those who had guided the company's progress over some 35 years. Moreover, it does not appear that Standard's independent auditors ever raised any question regarding the valuation of inventory; and their verification procedure, as reflected in Standard's annual reports, DX 4, 5, 6 and DX KK, LL, appear to be consistent with generally accepted accounting practice. A charge of fraud cannot be sustained on the conflicting evidence of business practice found in this record.

### Breach of Contract

PCC claims that Bollo breached the December 20, 1968 acquisition agreement in two respects. First, the failure to make inventory write-offs each year, PCC contends, was a breach of the representation and warranty that Standard's "financial statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved . . . ." PX 2, ¶ 2(e). Second, PCC maintains, the respective decisions of Whittaker and Bendix to sell repair parts for the second generation jets directly to the airlines and not through distributors was a "material adverse change . . . in the business or operations of Standard" which constituted a

breach of the representation and warranty contained in paragraph 2(f) of the agreement, p. 923 *supra*. Although the Whittaker-Bendix decisions were not announced until after the agreement was entered into, PX 15 and 23, pp. 916–917 *supra*, PCC relies on Bollo's agreement that "representations and warranties . . . shall be true and correct . . . as though they had been made at the Closing Date." PX 2, p. 923 *supra*.

■■■ The parties' agreement expressly provides that it shall be governed and construed according to New York law. PX 2, ¶ 14. In New York "[i]t is well settled that in construing the provisions of a contract we should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, we should give to the agreement a fair and reasonable interpretation [citations omitted]." *Aron v. Gillman*, 309 N.Y. 157, 163, 128 N.E.2d 284, 288 (1955). The meaning of "warranty" as used in the agreement is also well understood in New York law. "A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely." *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946). And it has long been known that if a material state of facts is warranted to exist which turns out not to be the case, the warrantor is liable for the loss or damage caused; and it is no defense that he acted upon misinformation and in good faith. *Brisbane v. Parsons*, 33 N.Y. 332 (1865).

Viewing the parties' agreement in light of the surrounding circumstances, there can be little question that Bollo's purpose was to sell and PCC's purpose was to acquire a going business it would continue to operate as part of its own conglomerate enterprise. There was here no sale of assets, such as a stock of inventory in which the presence of a large number of unsalable items might well constitute a breach of warranty of merchantability, express or implied, and thereby entitle a purchaser to recovery of damages. To be sure, in acquiring Standard, PCC relied in part on "financial statements" furnished by Bollo for the years 1965 through 1969, PX 4, 5, 6 and DX KK and LL, and had the right to treat them as fairly presenting Standard's inventory values and financial condition at the close of each annual period. The question remains, however, whether the financial statement warranty was in fact breached by Bollo.

Emphasizing that inventory represented the larger portion of Standard's assets, PCC argues that Standard employed a haphazard inventory write-off procedure which resulted in greatly overstated inventory values during the years 1965–69. Had Standard followed a consistent write-off policy in conformity with generally accepted accounting principles, says PCC, it would have written off an additional $183,765 in inventory "deadstock" [34] in 1967, $291,304 in 1968, and $381,082 by the date of closing, September 18, 1969. The failure to do so, PCC claims, was a breach of warranty which made it necessary for PCC in late 1970 to write off $444,247 in inventory items for which there had been no sales in the prior two years, "excess" stock and items "considered unsalable because of the Bendix cancellation." DX RR. It therefore claims as damages at least the $381,082 not written off at the time of closing.

■■■ At the core of PCC's warranty claim is a construction of "generally accepted accounting principles" which the court is unable to find reasonable in light of the nature of Standard's business and the circumstances surrounding the transaction between the parties. One can agree that the function of the certified public accountants who prepared Standard's financial reports was "not merely to verify the correctness of the addition and subtraction of the company's bookkeepers." See *Herzfeld v. Laventhal, Krekstein, Horwath & Horwath*, 540 F.2d 27, 34 (2d Cir. 1976). The claim here, however, is not really directed to the accuracy or adequacy of the financial statements. Rather it challenges the business

---

**34.** "Deadstock" was used by PCC to describe all so-called unsalable parts, a use with which Standard's inventory manager did not agree, p. 927 *supra*.

judgment of Standard's management in not taking greater advantage of liberal write-off opportunities at the close of each year. Such criticism, in hindsight, may be justified. It is no basis, however, for construing "generally accepted accounting principles" as a warranty that all inventory which might have been written off was in fact so treated on the company's books.

The breach of warranty claim derives no support from the repeated assertion that Bollo was the source of Bonar's version of Standard's write-off policy, p. 919, *supra.* PCC's own witness, Rushia, corroborated Bollo's denial that Standard had any other inventory policy than the one it actually practiced. The write-off procedure as described by Rushia was undeniably haphazard, but not out of keeping with a small company whose general management practices, as Bonar put it, "are characterized by Paternalism with most of the top staff . . . having worked up through the ranks to their present position." PX 9. Indeed, McDowell had also noted that Standard's "financial man . . . is not much more than a competent bookkeeper." PX 8, p. 4.

PCC's expert witnesses also opined no more than that Standard's inventory write-off method was inadequate. David Christopher, a partner of Price, Waterhouse & Company, PCC's outside auditors, while expressing the belief that Standard's "methodology" was not consistent with generally accepted accounting principles, conceded there was no accounting textbook authority for writing off inventory in any given period of time as expressed in a two-year rule, a six-months rule or the like. Tr. 338–40. And William Carolla, the former president of one of Standard's major competitors, n.

17a *supra,* thought that a write-off formula, within the range of six months to two years, based upon business judgment would not be unreasonable. Tr. 433.

Finally, it is manifest that PCC had no interest in the state of Standard's inventory until late in 1970 when it was confronted with the Whittaker-Bendix cancellations. DX RR. The Whittaker distribution agreement, DX Y, provided that on giving five months notice of cancellation, Whittaker was not obligated to repurchase inventory items but had the right to do so, the cost to be determined on the FIFO method of accounting. Whittaker, however, extended the distributorship through December 31, 1971, n. 20 *supra,* thereby enabling PCC to dispose of Whittaker products in the regular course of trade. The Bendix cancellation became effective October 1, 1970, and that distributor agreement gave Bendix the option to repurchase inventory items with the right to reject parts not "in first class condition and salable as new merchandise." DX FF, ¶ 20.

PCC stipulated that its auditors, Price Waterhouse, examined Standard's inventory *records* as of September 25, 1970. It was after that examination that PCC wrote off $444,247 in inventory items ranging in value from $50 to $499 and upwards. Also written off was $178,649 in items under $50 in value. DX RR. As already noted, included in all these items was "excess" stock and items considered unsalable because of the Bendix cancellation. *Id.* Through the use of a random number generator computer program, Price Waterhouse, on a sampling basis, reconstructed what it considered to be the annual write-off Standard should have made using a "two-year rule." The resulting table appears in the margin.[35]

**35.** SUMMARY OF MOST PROBABLE VALUE OF INVENTORY CONSIDERED DEADSTOCK UNDER APPLICATION OF THE "TWO-YEAR RULE"

| | Deadstock | | | | Deadstock | |
|---|---|---|---|---|---|---|
| | Becoming Deadstock During Year Ended December 31 | Balance at December 31 | | | Becoming Deadstock During Year Ended December 31 | Balance at December 31 |
| 1961 | $ 318 | $ 318 | | 1966 | $ 39,772 | $ 107,507 |
| 1962 | 7,578 | 7,896 | | 1967 | 76,258 | 183,765 |
| 1963 | 9,223 | 17,119 | | 1968 | 107,539 | 291,304 |
| 1964 | 23,363 | 40,482 | | 1969 | 126,034 | 417,338 |
| 1965 | 27,253 | 67,735 | | | | |

On the evidence the conclusion is unavoidable that PCC's expert computer assisted methods of inventory control cannot be made the standard for construing "generally accepted accounting principles" and imposing liability for breach of warranty upon Bollo.

█ Turning now to the second branch of PCC's warranty claim, there is no merit to the contention that Standard's failure to share in the second generation jet parts business was a breach of the warranty that "[s]ince December 31, 1967, there has been no material adverse change in the financial condition or in the business or operations of Standard." PX 2, ¶ 2(f). There were to be sure technological and economic changes in the aviation industry which undoubtedly *affected* the business of all who had dealings with that industry. But to say that these extrinsic developments constituted material adverse changes in Standard's existing business or financial condition is patently unreasonable.

Bollo undoubtedly hoped that the advent of the big jets would mean greater business for Standard, but it was business not yet existing or within reach. The decision of the manufacturers to deal directly with the airlines took nothing from Standard except great expectations. PCC may have shared those expectations but their dissolution did not destroy the business it purchased as Standard's 1972 sales figures show. There was no warranty against such an eventuality and none was breached.

Judgment is directed in favor of defendant Louis J. Bollo dismissing the complaint.